Robert E. **HARMER**, Plaintiff,

v.

**VIRGINIA ELECTRIC AND POWER COMPANY, Defendant.**

No. 93–CV–168.

United States District Court,
E.D. Virginia,
Richmond Division.

Sept. 20, 1993.

**1302**

Yvonne Steenstra Wellford, John Sykes Barr, Maloney, Yeatts & Barr, P.C., Richmond, VA, for plaintiff.

Donald Lester Creach, Hill B. Wellford, Jr., Hunton & Williams, Richmond, VA, for defendant.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

This matter is before the Court on defendant Virginia Electric and Power Company's ("Virginia Power's") motion for summary judgment, made pursuant to Fed.R.Civ.Proc. 56(b). For the reasons set forth below, the Court grants the defendant's motion.

### I. *Facts*

▆ The plaintiff, Robert E. Harmer, is suing defendant Virginia Power for discriminating against him because of his disability, in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 *et seq.* ("ADA"). The suit arises out of Harmer's requests over several years that Virginia Power create a smoke-free work environment as an accommodation to Harmer's pulmonary disability. Harmer alleges that Virginia Power failed to provide reasonable accommodation for his condition as required by the ADA and that after he requested a ban on smoking Virginia Power retaliated against him by reducing his purchasing authority and by not giving him a promotion. Harmer seeks an injunction against further discrimination by Virginia Power.[1] In addition, Harmer seeks an award of past and future wages and benefits that he would have earned absent any discrimination, compensatory and punitive damages, attorneys fees and costs.

Harmer began working for Virginia Power in 1981. Since 1986, he has worked as a buyer in the purchasing department at Virginia Power's corporate headquarters located at One James River Plaza in Richmond, Virginia. He works exclusively on the twelfth floor of One James River Plaza in an unenclosed cubicle. His duties currently include receiving requisitions, competitive bidding,

---

1. Effective August 1, 1993, Virginia Power banned smoking in all its facilities except in designated smoking rooms. Nevertheless, the plaintiff contends that a Court declaration and an injunction are necessary to prevent Virginia Power from altering its nonsmoking policy at will. Therefore, because mere voluntary cessation of allegedly illegal conduct does not make a case moot, the Court has jurisdiction to decide this case. *DeFunis v. Odegaard,* 416 U.S. 312, 318, 94 S.Ct. 1704, 1706–07, 40 L.Ed.2d 164 (1974).

evaluating bids and administering purchase orders.

Harmer has bronchial asthma, a severe reactive airway disease for which he is steroid dependent. (Compl. ¶ 3.) His doctor, Michael Z. Blumberg, M.D., asserts that Harmer's disability "substantially limits his ability to care for himself, his ability to breathe, his ability to walk and his life expectancy." (Blumberg Aff. ¶ 2.) The doctor also states that tobacco smoke in Harmer's work environment was a major contributor and aggravant to his health problem. (Id. at ¶ 3.) [2]

Accordingly, in September 1989, Harmer and some other employees on the twelfth floor submitted a petition asking that the twelfth floor be declared a non-smoking area. In response, Michael Lindsey, the then Manager of Purchasing for Virginia Power, asked that a study be conducted of the air quality on the twelfth floor. The results of the study, which were issued in January 1990, indicated that carbon dioxide concentrations were generally below the recommended maximum.[3] (See Lindsey Aff. Ex. A.) On the other hand, W.M. Sorey, an industrial hygienist for Virginia Power and the author of the report, noted that the overriding complaint of twelfth-floor employees was of cigarette smoke. (Id. Ex. A) He indicated, however, that the company had no method of quantifying the amount of smoke in the air and no standards to compare amounts to. (Id.) Therefore, he concluded that smoking policy had to be a management decision, but advised that "a policy such as restricting smoking to an individual's cubicle is probably

as bad as no policy at all. With the low partitions and the type of ventilation system we have in this building, this type of policy can only be seen as a 'victory' for smokers and a 'defeat' for non-smokers." [4] (Id.)

Lindsey also reviewed Virginia Power's smoking policies and reported in a memorandum to purchasing employees in March 1990 that the company had provided fans, smokeless ashtrays and air purifiers and had moved employees to increase the space between smokers and nonsmokers. (Harmer Dep. Ex. 23.) In addition, Lindsey announced new rules prohibiting smoking in the rest rooms, conference rooms and hallways on the twelfth floor and limiting smoking to the smoker's cubicle. (Id.) He announced in the memorandum the creation of a twelfth-floor Smoking Policy Committee to study the situation and to make recommendations to management for changes in the floor's smoking policy. (Id.)

In March 1990, Harmer discussed with Virginia Power the possibility of transferring to Virginia Power's Surry Nuclear Power Station, where smoking was prohibited in the purchasing and materials area. Virginia Power alleges that Harmer was offered the job transfer and refused it for personal reasons, though he admitted that the transfer would benefit his career progression, personal life and health. (See Lindsey Aff. ¶ 9 & Ex. C.) Harmer states that the possibility of transfer was not raised again after Virginia Power refused to compensate him for the substantial expenses he would incur in relo-

---

**2.** Harmer informed Virginia Power of his condition in a letter from his doctor, Maynard C. Dyson, M.D., dated December 12, 1986. (Harmer Dep. Ex. 22.) In the letter, the doctor stated that a smoke-free environment was necessary to minimize Harmer's need for medication and that "tobacco smoke will seriously impair his respiratory status and therefore, cause him to have to use medications with increased side effects." (Id.)

**3.** The study measured carbon dioxide levels at several locations on the floor to evaluate whether adequate quantities of outdoor air were being introduced into the building. (Lindsey Aff. Ex. A) One of the points where the levels were measured was the cubicle next to Harmer's.

(Id.) This location had the lowest peak level of carbon dioxide of all the places where measurements were taken. (Id.) None of the locations had carbon dioxide levels exceeding 1000 parts per million, the upper limit guideline above which complaints of headache, fatigue and eye irritation become widespread. (Id.)

**4.** Three days later, Sorey sent Lindsey a second report summarizing the results of the preliminary air quality study for use by the smoking policy committee, which Lindsey created. (Pl.'s Br. Opp'n Summ. J. Ex. 3.) In this version of the report, Sorey deleted his advice to Lindsey concerning the ineffectiveness of limiting smoking to smokers' cubicles.

cating.[5]

In August 1990, in order to comply with the Virginia Indoor Clean Air Act, Virginia Power prohibited smoking in elevators, cashier and service lines, cafeterias (except in designated smoking areas), auditoriums, stairways and hallways. (*See* Harmer Dep. Ex. 24.) Individual managers were authorized to adopt additional smoking restrictions as needed. (*Id.*)

In December 1990, the twelfth-floor Smoking Policy Committee released its recommendations to management concerning a proposed smoking policy. The committee recommended strict enforcement of the existing smoking policy, the provision of smokeless ashtrays and/or air filtration devices for use by smokers and placement of air filtration devices and high oxygen output plants at strategic locations on the floor. (Lindsey Aff. Ex. D.) In response to these recommendations, smokeless ashtrays were made available, but not mandatory. (*Id.*) In addition, plants were relocated and added to the floor. (*See* Harmer Dep. Ex. 26.)

The plaintiff, unsatisfied with these measures, requested in writing in July 1992 that Virginia Power declare the entire building smoke free. (Harmer Dep. Ex. 27.) Virginia Power formed a committee to review the request, which resulted in a decision to move the two smokers seated closest to Harmer. (*See* Harmer Dep. Ex. 28.) In addition, a company doctor on the committee reviewed medical information from Harmer's doctor and concluded that it was inconclusive that tobacco smoke was a major contributor to Harmer's health problems.[6] (*Id.*)

In June 1993 Virginia Power announced that, effective August 1, 1993, smoking would be prohibited in all its facilities, except in specially constructed smoking rooms. (Rigsby Aff. Ex. A.) Robert E. Rigsby, vice president of human resources for Virginia Power, asserts that the company considered this change in its policy when it learned in late 1992 that the Environmental Protection Agency would be issuing a report concluding that tobacco smoke in the work place is hazardous to nonsmokers.[7] (Rigsby Aff. at ¶ 2.) Virginia Power asserts that it had to weigh several considerations before the non-smoking policy could be adopted, including the effects on employee morale, the potential loss of productivity from employees who smoke and the additional costs of the change.[8]

Harmer also alleges that Virginia Power retaliated against him because of his efforts to enforce his rights under the ADA, in violation of 42 U.S.C. § 12203, by reducing his purchasing authority and by filling a vacant position as project expeditor—nuclear with a less senior, less qualified and less experienced employee. Harmer states that before October 1992 his purchasing authority was $50,000, which he assumed was because he was a more experienced buyer. In October 1992, however, on the same day that he received the response to his request that the building be declared smoke free, Harmer's purchasing authority was reduced to $25,000. Paul H. Dodson, Virginia Power's purchasing manager, states that an administrative error, which was discovered in a routine check of the purchasing authority list, had caused the increase in Harmer's authority. Once the

5. According to Harmer, these expenses would be generated by the necessity of finding alternate after-school care for his child of whom he has sole custody and of commuting three hours each day.

6. The committee also called into question the seriousness of Harmer's illness by noting that he had often been observed sitting in the smoking section of the company cafeteria. (Harmer Dep. Ex. 28.) Harmer contends that he sometimes sits in this section because it is the best ventilated area in the cafeteria.

7. Harmer asserts that contemporaneous with the issuance of the EPA report he requested that Virginia Power designate the twelfth floor smoke

free and was told that Virginia Power was studying the issue of smoking in the work place and would announce its policy shortly.

8. The company stated that these costs include the cost of constructing special smoking rooms, the time and effort of conducting focus group meetings with employees to discuss policy options, the costs of funding smoke-cessation programs for employees and their spouses and the necessity and effort of negotiating over the policy with the union that represents about 40% of Virginia Power's work force.

error was discovered, Dodson states, Harmer was informed that his purchasing authority was $25,000, consistent with that of all other buyers in the company.

Harmer disputes this rationale because, he states, the fact that many people are involved in the decision to set limits on purchasing authority gave Virginia Power sufficient opportunity to catch mistakes. Harmer also points to other incidents that he believes support his retaliation claim. First, Virginia Power recently disciplined him for the first time by giving him an oral warning for engaging in a twenty-minute conversation with two other employees during work hours. Second, Harmer's annual rating on job performance declined from "A1 Hi" (high average) in 1991, before he requested accommodation for his disability, to "A1 Lo" (low average) in 1992, after he had made the request.[9] Third, Lowell Carrington, the director of the Virginia Power purchasing group in which Harmer works, stated that Virginia Power currently does not consider Harmer promotable because of comments Harmer made, which reflect that he is a racist and has problems with females. Carrington admitted, however, that he had no first-hand knowledge about the alleged comments and that he had made no attempt to verify whether Harmer had in fact made them.

Harmer also claims that he should have a chance to determine by deposition whether Donald Smith, the employee awarded the nuclear project expediter position, was more qualified. On the other hand, Kerry Owens, the director purchasing—nuclear for Virginia Power, alleges that Smith was more qualified because of his current knowledge of the highly regulated area of nuclear purchasing. He states that Smith had worked in the nuclear area since 1987 while Harmer had not had any significant involvement with nuclear purchasing since 1986. He also states that

Smith showed more responsibility and independent judgment than Harmer. Harmer, however, was never actually considered for the position because he did not know about or apply for it.

*Analysis*

## I. SUMMARY JUDGMENT UNDER RULE 56

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Facts are material if they might affect the outcome of the case; there is a genuine issue of fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ But, especially in an employment discrimination case, where the employer's state of mind and motive are often critical determinations, a court must find that it is perfectly clear that there are no genuine issues of material fact before granting summary judgment. *See Ballinger v. North Carolina Agricultural Extension Service*, 815 F.2d 1001, 1004–05 (4th Cir.1987), *cert. denied*, 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987).

■ A party, like the plaintiff, opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. Furthermore, to defeat Virginia Power's summary judgment motion, the plaintiff must produce some evidence establishing every element on which he will bear the burden of proof at trial. *Celotex Corp v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

---

9. According to the evaluation forms, an A1 designation indicates that "[p]erformance consistently meets job requirements." There are three A1 designations, A1 Hi, A1 Med and A1 Lo. Employees who perform best receive a rating of A3, which indicates that "[p]erformance and accomplishments consistently exceed job requirements." Above average employees receive an A2 rating, which indicates that "[p]erformance consistently meets and frequently exceeds job requirements." Below average employees receive a B1 rating, which indicates that "[p]erformance sometimes falls below job requirements in at least one area, and improvement is necessary." Finally, the worst performers receive a C1 rating, which indicates that "[p]erformance consistently falls below job requirements."

## II. THE DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM OF FAILURE TO ACCOMMODATE

The ADA forbids discrimination by covered employers against a qualified individual with a disability.[10] 42 U.S.C. § 12112(a) (Supp. III 1992). Discrimination includes failure to provide reasonable accommodations for the physical or mental limitations of an otherwise qualified individual with a disability unless the accommodation would impose an undue hardship on the operation of the employer's business. 42 U.S.C. § 12112(b)(5)(A). The act defines a qualified individual with a disability as a disabled individual who, with or without reasonable accommodation, can perform the essential functions of his position.[11] 42 U.S.C. § 12111(8). In addition, an individual with a disability is "otherwise qualified" if he is qualified for a job except that, because of the disability, he needs a reasonable accommodation to be able to perform the job's essential functions. 29 C.F.R. app. § 1630.9 (1992). Regulations implementing the employment provisions of the ADA define reasonable accommodation as, *inter alia:*

> (ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position; or
>
> (iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.[12]

29 C.F.R. §§ 1630.2(*o*).

■ Therefore, the ADA protects Harmer from discrimination due to his disability.

But Harmer still must show that he is entitled to a complete smoking ban as a reasonable accommodation to his disability, and he is unable to do so. As the Court reads the ADA, the purpose of reasonable accommodation is to allow a disabled employee to perform the essential functions of his job or to enable him to enjoy equal privileges of nondisabled employees, such as access to bathrooms and cafeterias, etc. *See* 29 C.F.R. §§ 1630.2(*o*), app. 1630.9; Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act, at I–3.3 (1992). Harmer is not entitled to absolute accommodation under the ADA because he can perform the essential functions of his position with the reasonable accommodations made by Virginia Power as evidenced by his job performance appraisals, which indicate that he consistently met his job requirements. (*See* Harmer Dep. Exs. 7–18.) No evidence has been offered to suggest that Harmer's productivity was not comparable to that of other employees, and Harmer's average job performance appraisals constitute affirmative evidence that his productivity was satisfactory.

The District of Columbia Circuit has upheld a similar interpretation by the district court of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* In *Carter v. Bennett,* the circuit court upheld the district court's finding that "[t]he government is not obligated ... to provide plaintiff with every accommodation he may request, but only with reasonable accommodation as is necessary to enable him to perform his essential functions." 651 F.Supp. 1299, 1301 (D.D.C.1987), *aff'd,* 840 F.2d 63, 67 (D.C.Cir.1988). In drafting the ADA, Congress consciously drew on the law that developed under the

---

**10.** Virginia Power, as an employer engaged in an industry affecting commerce who has 25 or more employees, qualifies as a covered employer under the act. *See* 42 U.S.C. § 12111(5) (Supp. III 1992).

**11.** The Act defines disability as a physical or mental impairment that substantially limits one or more of an individual's major life activities, a record of such an impairment or being regarded as having such an impairment. 42 U.S.C.

§ 12102(2). The Court assumes for purposes of Virginia Power's summary judgment motion that Harmer has a disability as defined by the act.

**12.** The ADA gives examples of actions by an employer that might constitute reasonable accommodation, such as making existing facilities accessible to and usable by the disabled, job restructuring and modification of equipment. *See* 42 U.S.C. § 12111(9).

Rehabilitation Act, and the legislative history of the ADA indicates that reasonable accommodation is to be interpreted consistently with the regulations implemented under sections 791 ·and 794 of the Rehabilitation Act. Jeffrey O. Cooper, Comment, *Overcoming Barriers to Employment: The Meaning of Reasonable Accommodation and Undue Hardship in the Americans with Disabilities Act,* 139 U.Pa.L.Rev. 1423, 1436 (1991); *see also* 42 U.S.C. § 12117(b), 29 C.F.R. app. § 1630.4 (1992) ("The range of employment decisions covered by this nondiscrimination mandate is to be construed in a manner consistent with the regulations implementing § 504 [codified at 29 U.S.C. § 794] of the Rehabilitation Act of 1973.") Therefore, cases brought under the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.,* can shed some light on Harmer's case. But most of the cases cited by Harmer and Virginia Power are inapposite to this case because they involve plaintiffs who could not or some question existed as to whether they could perform the essential functions of their positions. *See, e.g., Langon v. Dep't of Health and Human Servs.,* 959 F.2d 1053, 1058 (D.C.Cir. 1992) (holding that employee with multiple sclerosis who sought to work at home as a reasonable accommodation was required to provide evidence to her employer showing that her disease had intensified to the point where commuting was impossible), *Doe v. Boeing Co.,* 121 Wash.2d 8, 846 P.2d 531 (1993) (holding that the scope of an employer's duty to accommodate an employee's condition is limited to those steps reasonably necessary to enable the employee to perform his job); *but see Vickers v. Veterans Admin.,* 549 F.Supp. 85, 87 (W.D.Wash.1982) (refusing to decide whether the defendant was under a duty to make reasonable accommodations for plaintiff with hypersensitivity to tobacco smoke but who could perform his job).

▮ Therefore, because the evidence established that Harmer could at all times adequately perform his employment duties, Harmer is not entitled to further accommodation under the ADA. Harmer has produced an affidavit in which his doctor, Dr. Blumberg, states that the measures taken by Virginia Power were insufficient to enable Harmer to perform his essential duties. (Compl. Ex. 1) But this affidavit is insufficient to raise a genuine issue of fact given the doctor's lack of knowledge of Harmer's duties and his working conditions. The doctor states in his deposition that he has no information about the air quality in Harmer's building besides the information provided by Harmer. He admits that he did not know the number of smokers on the floor where Harmer works, how far away from Harmer they sit or the number of employees on Harmer's floor. He admits that he does not know the dimensions of the floor or how far away from Harmer a smoker would have to sit to alleviate Harmer's problems. He admits that he is unaware of whether air quality studies have been performed in Harmer's building and so does not know the results of any such study. Thus, the doctor has, for example, no information about whether there is dust or pollen in the air in Harmer's building though Harmer is allergic to both. In addition, the doctor, though aware that Harmer hunts and fishes, states that he has placed no limitations on Harmer's activities. Most importantly, the doctor admits that he does not know the essential functions of. Harmer's position, and he does not know whether the presence of smoke has prevented Harmer from performing any functions of his position. Thus, Dr. Blumberg's mere conclusory opinions, which are not based on personal knowledge as required by Fed. R.Civ.P. 56(e), cannot raise a genuine issue of material fact. *Catawba Indian Tribe v. South Carolina,* 978 F.2d 1334, 1341–42 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993).

### III. THE .DEFENDANT IS ENTITLED TO SUMMARY . JUDGMENT · ON PLAINTIFF'S · RETALIATION CLAIM

#### A. *Change in Purchasing Authority*

▮ Harmer contends that Virginia Power retaliated against him for requesting accommodation by reducing his purchasing authority from $50,000 to $25,000. The ADA prohibits such retaliation by an employer against an employee who enforces his rights

under the act. *See* 42 U.S.C. § 12203(a).[13] To prevail on his retaliation claim, Harmer must follow a three-step proof process.[14] First, he must establish a prima facie case of retaliation by a preponderance of the evidence. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir.1985). To establish such a prima facie case, a plaintiff must prove that (1) he engaged in protected activity; (2) his employer took an adverse employment action against him and (3) a causal connection exists between the protected activity and the adverse action. *Id.* If Harmer satisfies this burden, then Virginia Power must articulate a legitimate non-retaliatory reason for its action. *Id.* Should Virginia Power do so, then Harmer must prove by a preponderance of the evidence that Virginia Power's articulated reason is unworthy of belief and that the real reason for Virginia Power's action was to retaliate against him for having taken the protected action of requesting accommodation. *Id.;* see also *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981).

 Assuming that Harmer has established a prima facie case of retaliatory motivation, he still cannot prevail because Virginia Power has articulated a nonretaliatory reason for reducing Harmer's purchasing authority, and Harmer has not adduced sufficient evidence that Virginia Power's reason is pretextual.[15] Harmer does not refute Virginia Power's contention that $25,000 was the established purchasing authority for buyers. He states that he assumed he had increased authority because of his years of experience. In response to Virginia Power's contention that the initial increase was caused by an administrative error, Harmer states that someone should have caught the error because many people sign the form increasing an employee's purchasing authority. In addition, Harmer calls attention to the fact that the reduction in his purchasing authority took place on the same day as Virginia Power denied his request for a smoke-free work place. Furthermore, to provide general support for his retaliation claim, he points to a recent oral reprimand, a decrease in his job performance rating and a statement by the director of his purchasing group that Harmer is not now promotable because of sexist and racist comments he has made.[16] These allegations provide insufficient evidence of pretext. The allegations do not "present affirmative evidence . . . from which a jury might return a verdict in [plaintiff's] favor." *Anderson v. Liberty Lobby*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Instead, this evidence is

**13.** The section provides, "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act."

**14.** The United States Supreme Court first articulated this burden of proof arrangement in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), an employment discrimination action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000c *et seq.* (1989). Since then, the scheme has been adopted and applied to claims brought under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* *See Slusher v. Arlington County*, 673 F.Supp. 752 (E.D.Va. 1987).

**15.** In addition, it is arguable that Harmer has not suffered an adverse employment action, and therefore cannot establish a prima facie case. Virginia Power has offered evidence that all other employees with the job classification of buyer had a purchasing authority of $25,000 and that the increase in Harmer's purchasing authority to $50,000 was the result of an administrative error. Harmer admits that he has never had occasion to purchase items over $25,000. Furthermore, both sides agree that the reduction in purchasing authority did not change Harmer's salary or his duties. Finally, both sides agree that about four months after the reduction in Harmer's purchasing authority, Harmer received a pay increase and around the same time his purchasing authority, along with the other purchasing employees, was increased.

The Court does not decide this issue, however, because it holds that Harmer has adduced inadequate evidence that Virginia Power's explanation of its reduction in his purchasing authority was merely pretextual.

**16.** With respect to the decrease in his performance rating, Harmer fails to note, however, that both his ratings on job knowledge and communications and work relationships stayed at medium average from 1991 to 1992. In addition, for both 1991 and 1992, his overall rating was medium average.

wholly circumstantial and therefore encourages the fact-finder to engage in conjecture. Harmer must raise an inference of retaliation that has reasonable probability not mere possibility. *See Autry v. North Carolina Dep't of Human Resources,* 820 F.2d 1384, 1386 (4th Cir.1987); *Lovelace v. Sherwin–Williams Co.,* 681 F.2d 230, 241–46 (4th Cir. 1982).

### B. *Failure to Promote*

 Similarly, the plaintiff's allegation that Virginia Power retaliated against him for requesting accommodation by not promoting him to the position of project expeditor—nuclear cannot withstand the defendant's motion for summary judgment. The Fourth Circuit has established the elements of a prima facie case of discriminatory failure to promote where, as here, the plaintiff is complaining that someone else was selected for the promotion so that the position did not remain open. *See Autry,* 820 F.2d at 1385–86. Adapting these elements to Harmer's claim of disability discrimination, they become: (1) that Harmer engaged in protected activity by requesting accommodation; (2) that Harmer applied for and was qualified for the position of project expeditor—nuclear; (3) that, despite his qualifications, he was rejected; and (4) there is some evidence that his having requested accommodation was a factor considered by his employer in not granting him the promotion.

It is undisputed that Harmer never applied for the position; therefore, he was never considered for it and can only satisfy the first element of his prima facie case. A plaintiff may be excused from applying for a desired position if such an application would have been futile. *Holsey v. Armour & Co.,* 743 F.2d 199, 208–09 (4th Cir.1984), *cert. denied,* 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985). But Harmer admits that he did not apply for the position because he was unaware of its availability.

There is no evidence that Virginia Power retaliated against Harmer by failing to promote him to the project expeditor—nuclear position. Though the position seems to have been filled within the nuclear purchasing group without any publication of a vacancy, there is no evidence to suggest that Virginia Power failed to publicize the vacancy because it wanted to exclude Harmer. Furthermore, assuming that Harmer could establish a prima facie case, he could not prevail on his retaliatory failure to promote claim because Virginia Power has articulated legitimate, nonretaliatory reasons for its decision. The director purchasing—nuclear for Virginia Power states that, had he considered Harmer for the nuclear purchasing position, he would have found Harmer unqualified for it and certainly less qualified than Donald Smith, the employee who received the promotion. He states that Smith had been in the nuclear area for the past seven years, had current knowledge of the regulatory requirements and had effectively filled the position on a temporary basis for several months. On the other hand, Harmer's experience in the nuclear purchasing field dating from 1986 and earlier was outdated.

Harmer fails to make a sufficient showing that these reasons are pretextual. In response to these legitimate reasons, Harmer admits that he does not know the requirements of the nuclear purchasing position, but contends that the requirements are the same as they were in 1981 to 1985 when he worked in the nuclear purchasing area. This contention is insufficient to avoid summary judgment. Harmer may not rely on an allegation of his pleading, but must set forth specific facts showing that a genuine issue exists as to whether the job requirements in the nuclear purchasing area have changed.

Furthermore, Harmer bases his assertion that he is more qualified than Smith on a six to twelve month period in 1985 or 1986 when he worked with Smith. Harmer admits that he knows nothing of Smith's work history at Virginia Power and knew nothing about Smith's performance history until his lawyer showed him Smith's performance ratings (which are favorable). This bald assertion is similarly insufficient to avoid summary judgment on this claim.

For the reasons stated above, the Court holds that the defendant did not violate the

ADA and that summary judgment must be in favor of the defendant.