**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,**
Plaintiff,

v.

**NEWPORT NEWS SHIPBUILDING & DRYDOCK COMPANY,**
Defendant.

**Civil Action No. 4:96cv47.**

United States District Court,
E.D. Virginia,
Newport News Division.

Dec. 18, 1996.

Debra M. Lawrence, Equal Employment Opportunity Commission, Baltimore District Office, Baltimore, MD, Lawrence R. Leon-

ard, Office of the United States Attorney, Norfolk, VA, for plaintiff.

Marguerite Rice Ruby, Hunton & Williams, Richmond, VA, Dean C. Berry, Newport News Shipbuilding & Drydock Company, Office of General Counsel, Newport News, VA, for defendant.

### OPINION AND ORDER

MORGAN, District Judge.

On April 8, 1996, the Equal Employment Opportunity Commission ("EEOC") filed suit on behalf of Eugene O'Donnell ("O'Donnell"), an employee with Newport News Shipping and Dry Dock Company ("Company"), alleging that the Company refused to reasonably accommodate O'Donnell's need for a mold-free work environment in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq. (1995). O'Donnell alleges that his preexisting allergies to airborne molds and fungi are exacerbated by his status as Human Immunodeficiency Virus ("HIV") positive, and that exposure to these molds and fungi weaken his already suppressed immune system. Plaintiff is seeking to enjoin the Company from future discrimination against disabled employees, back pay, reasonable accommodations for O'Donnell, and punitive damages. Pending before the Court is Defendant's Motion for Summary Judgment.[1]

The Court ruled from the Bench **FINDING** that even if O'Donnell qualifies for protection under the ADA, the Company has made every effort to reasonably accommodate him. Therefore, the Defendant's Motion for Summary Judgment was **GRANTED.** This opinion will further explain the rationale for the Court's findings.

### I. Facts.

O'Donnell has been employed with the Company for 25 years, most of that time in an administrative capacity. O'Donnell was diagnosed as HIV positive in 1988 and has been under the care of two physicians, Dr. Edward Oldfield, a specialist in infectious disease, and Dr. Benjamin Eng, a family practitioner and O'Donnell's primary care physician.

Although O'Donnell had preexisting allergies and a sinus condition, he alleges that in 1990 he began to experience flu-like symptoms in response to allergens and temperature changes in his office located in Building 78. In his affidavit and report, Dr. Oldfield explained that the HIV infection commonly leads to the enhanced allergic reaction and sinusitis alleged by O'Donnell. (Pl.'s Ex. 3) Dr. Oldfield's affidavit speaks in terms of the hypothetical HIV patient, it never specifically states that O'Donnell suffers such reactions.[2] In his deposition, O'Donnell testified that he does not have the breathing capacity he had two years ago, and that at times he finds himself gasping for breath and suffering from nausea, sore muscles and joints, headaches, and sleeplessness. (Pl's Ex. 1 at 44.) By way of example, O'Donnell explained that he used to be able swim 30 laps without any difficulty, but that now he is lucky if he can swim 8 laps. (Pl's Ex. 1 at 44.)

In 1990, O'Donnell told Cameron Blandford, the Vice President of Human Relations at that time, that he was HIV positive and suffering flu-like symptoms. He requested a transfer to an office in which he could better control the air quality and temperature. Accordingly, the Company relocated O'Donnell to an office with an air conditioning unit in Building 161. O'Donnell changed the air filters on a weekly basis and installed his own humidifier.

1. Local Rule 10(E)(3) requires that good cause be shown in advance of filing a brief in excess of thirty (30) pages in length. Both Defendant's brief, thirty-eight (38) pages, and Plaintiff's brief, forty-two (42) pages, exceed the thirty (30) page maximum allowed under Local Rule 10(E)(3). The Defendant did not make a Motion to Waive the requirements of Rule 10(E)(3). Plaintiff's Motion for Waiver of Rule 10(E)(3) was filed on October 22, 1996, the same day as the excessively long brief.

2. In his affidavit Dr. Oldfield states: "The HIV positive patient experiences a progressive elevation of Immunoglobulin E and eosinophils, which results in the body's overreaction to allergens. Instead of simply experiencing runny noses and itchy eyes, the HIV positive patient can experience flu-like symptoms when exposed to allergens." (Plaintiff's Ex. 3)

In 1991, O'Donnell's new supervisor, Eddie Morris, sought to have him moved back to Building 78 with the rest of the department. Blandford intervened on O'Donnell's behalf and prevented the move at that time. From 1990 until January 1994, O'Donnell worked from his office in Building 161 and continued to experience sinus infections and allergies. (O'Donnell Tr. at 201, 205–07.)

In January 1994, O'Donnell's new supervisor, Tim Keatts, relocated the entire department from Building 78 to Building 29 and informed O'Donnell that he would have to relocate as well. O'Donnell, concerned that he would have less control over the air quality and temperature in Building 29, communicated his concerns to: Jerry Bollinger, the Manager of Trades Administration; George Decker, the Manager of Human Resources; and Dr. Eng. At O'Donnell's request, Dr. Eng wrote a letter explaining O'Donnell's concern to Keatts. Dr. Eng communicated O'Donnell's concerns, but he did not believe that it was medically necessary for O'Donnell to stay in Building 161. (Eng Tr. at 114–115.)

In March 1994, O'Donnell moved to Building 29. On August 22, 1994, O'Donnell notified Dr. Eng that he believed his symptoms were connected to his work environment. O'Donnell alleges that a weekly cycle developed in which he would experience flu-like symptoms around mid-week, partially recover over the weekend, only to have the cycle repeat itself the following week. Dr. Eng referred O'Donnell to Dr. King, an allergy specialist, for allergy testing in September 1994. O'Donnell tested positive for 34 different items including dust, dog hair, trees, grasses, weeds, pollens, and molds, including aspergillus niger.

Convinced that the allergens in the air at his office were responsible for his symptoms, O'Donnell took a small sample of the air filter from Building 29 and had it tested by Microbac Laboratories, Inc., ("Microbac"). The test results showed the presence of the mold aspergillus niger, a mold to which Mr. O'Donnell is allergic. O'Donnell told Dr. Eng of the test results and asked him to write a letter explaining the result. Dr. Eng wrote the requested letter, in which he discussed the results of O'Donnell's allergy tests and the presence of aspergillus niger in the filter sample tested by Microbac. Dr. Eng indicated that he felt O'Donnell's health had declined over the last six months and that he would be happy to discuss O'Donnell's situation with the Company. This letter was not shown to O'Donnell's supervisors or the Company doctor, but was attached to his Complaint filed with the Office of Federal Contract Compliance Program ("OFCCP").

On October 13, 1994, Keatts met with O'Donnell and counseled him regarding his high rate of absenteeism during the year. O'Donnell explained that he thought the heating and air-conditioning systems were contributing to his poor health. Keatts informed him that the air-conditioning system was regularly maintained and that the filters were changed as needed. (Def.'s Ex. 21.) O'Donnell did not tell Keatts that he had had the filter tested and that the test results indicated aspergillus niger was present in the filter. (O'Donnell Tr. 381–82.)

On November 7, 1994, O'Donnell again visited Dr. Eng complaining of his cycle of flu-like symptoms.[3] Dr. Eng wrote a letter for O'Donnell to give to the Company, suggesting that O'Donnell stay away from work for seven days in order to see if his symptoms improved. (Def.'s Ex 23) O'Donnell did not take this letter to the Company, but instead attached it to his Complaint filed with the OFCCP.

Following receipt of the OFCCP complaint on November 16, 1994, Dr. Reid, the Company's doctor, contacted Dr. Eng and requested a letter documenting O'Donnell's illness and making recommendations as to what action the Company should take to accommodate him. On December 1, 1994, Dr. Eng faxed a letter to Dr. Reid, stating:

> Allergy testing, cultures, and other documents that you currently have in your possession appear to support our concern that Mr. O'Donnell's work environment has a deleterious effect on his health. There-

---

**3.** During this visit, O'Donnell also told Dr. Eng that his supervisor was "mentally trying to kill him" by reducing his responsibilities at work. (Eng's Tr. at 217.)

fore, it is my opinion that it is in Mr. O'Donnell's best medical interest to be moved from his current environment *or be placed on temporary leave until his current situation can be environmentally rectified.* (Def.'s Ex. 26) (Emphasis added).

Dr. Reid immediately placed O'Donnell on restrictions prohibiting him from working in high dust or mold environments. Beginning December 2, 1994, pursuant to Dr. Eng's recommendation, Decker placed O'Donnell on short-term disability leave while the Company determined how best to accommodate him.

O'Donnell was on short term disability leave from December 2, 1994, through May 12, 1995. During this time the Company placed new air filters in the air-conditioning systems in both Buildings 29 and 161. After running the systems, samples of the filters were taken and tested by Microbac.[4] Both locations tested positive for aspergillus niger. However, the test results revealed that the filter from Building 161, the building in which O'Donnell worked until March 1994, and from which he did not want to move, had higher levels than Building 29, the building to which O'Donnell did not wish to relocate for fear of poorer air quality.

Following the test results, the Company's Industrial Hygiene Department inspected Building 29 and made numerous alterations and repairs in an effort to reduce the presence of allergens in the air including the following: (1) standing water outside the building was removed and the underlying drainage problem was fixed; (2) moisture was removed from the ceiling; (3) a leak in the water fountain was repaired; (4) the air conditioning units and ductwork were cleaned; and (5) new air filters were installed.

One week after these improvements, Microbac ran new tests on the filters and found significantly lower total mold levels and no aspergillus niger. On April 25, 1995, O'Donnell was informed of the improvements, released from short-term disability, and told he could return to work. However, O'Donnell unilaterally decided not to return to work until May 15, 1995. O'Donnell states that during this period he was waiting for more recent test results on the air quality. The Company sent O'Donnell a copy of the March 1995 test results when it notified him that the improvements to Building 29 were complete. O'Donnell claims he was uncomfortable relying on the six week old test result and was hoping the Company would produce more current test results.

Following O'Donnell's return to work, the Company changed the air filters monthly. Periodically these filters were tested by the Company, and copies of the test results were provided to Dr. Eng. Some of the tests revealed the presence of the aspergillus niger mold.

In the Summer of 1995 some members of Keatts' staff were moved to Building 7. Before O'Donnell was moved, the company installed a new window air-conditioning unit and throughly cleaned and painted his new office. Since O'Donnell moved, the air conditioner filters have been changed on a weekly basis.

## II. Standard for Summary Judgment

Summary judgment under Rule 56 is appropriate only when the court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Terry's Floor Fashions, Inc. v. Burlington Indus., Inc.,* 763 F.2d 604, 610 (4th Cir.1985). Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts illustrating genuine issues for

---

4. The EEOC alleges and argued at the hearing that filter tests conducted by Microbac are unreliable because they were not collected properly. In fact, the report submitted by the EEOC's expert criticizes the risks taken by those collecting the samples without appropriate personal protection equipment, not the reliability of the test results. (Pl.'s Ex. 18.)

trial. *Celotex Corp.*, 477 U.S. at 322–24, 106 S.Ct. at 2552–53. Such facts must be presented in the form of exhibits and sworn affidavits. Failure by plaintiff to rebut defendant's motion with such evidence on his behalf will result in summary judgment when appropriate. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden. of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552.

### III · Analysis.

Under the Americans with Disabilities Act ("ADA"), covered employers are prohibited from discriminating against qualified individuals with a disability. Discrimination includes failure to provide reasonable accommodations for the physical or mental limitations of an otherwise qualified individual, unless the accommodation would impose an undue hardship on the operation of the employer's business. 42 U.S.C. § 12112(b)(5)(A).

In order for the EEOC to establish a *prima facie* case, it must produce facts from which a jury could find that: (1) O'Donnell has a disability within the meaning of the ADA; (2) O'Donnell is a qualified individual who, with or without reasonable accommodation, can perform the essential functions of his position; and (3) that the company failed to provide O'Donnell with reasonable accommodations as was necessary to enable him to perform his essential functions. *See Ennis v. National Ass'n of Business & Educ. Radio Inc.*, 53 F.3d 55 (4th Cir.1995).

The Court **FINDS** that assuming O'Donnell is disabled, there is no material fact in dispute upon which a jury could find that the Company failed to reasonably accommodate him. Therefore, the Defendant's Motion for Summary Judgment is **GRANTED**.

It is unnecessary to determine whether O'Donnell is disabled within the meaning of the ADA,[5] and the parties do not dispute that O'Donnell is otherwise qualified for his position. Therefore, the Court will only discuss the issue of reasonable accommodation.

### III. The Company Reasonably Accommodated O'Donnell.

The EEOC advanced the following two arguments: (1) the Company failed to reasonably accommodate O'Donnell when it forced him to move from Building 161 to Building 29 in March 1994; and (2) the Company failed to reasonably accommodate O'Donnell by placing him on short-term disability and improving Building 29, rather than simply returning him to his previous office in Building 161.

For the following reasons, both arguments must fail.

First, O'Donnell provided no information to the Company indicating that it was medically necessary for him to remain in his office in Building 161 in March 1994. In January 1994, Keatts told O'Donnell that he would have to relocate to Building 29. Keatts explained that as a new supervisor of a downsizing department, he needed to have everyone together so that he could evaluate the overall process, eliminate the unnecessary work and cross train the staff.

Dr. Eng, at O'Donnell's request wrote a letter to the Company requesting that O'Donnell not be moved unless "there are overwhelming reasons" for the move. But this letter is "insufficient to raise a genuine issue of fact given the doctor's lack of knowl-

---

**5.** While it was not necessary for the Court to determine whether O'Donnell is disabled within the meaning of the ADA, had such a determination been required, it is far from certain that the EEOC would have prevailed on this issue. The Fourth Circuit has decided that HIV-positive status is not *per se* a "disability" within the meaning of the ADA. *Ennis v. National Ass'n of Business & Educ. Radio Inc.*, 53 F.3d 55, 59 (4th Cir.1995). The court explained that the plain language of the statute requires a case-by-case determination of whether a given impairment substantially limits a major life activity of the particular individual in question. *Id.* at 60.

Dr. Oldfield's expert report states that "O'Donnell has had no opportunistic infections" associated with HIV. (Pl.'s Ex. 3.) O'Donnell's chief symptoms, sinusitis, watery eyes, and headaches associated with reactions .to airborne allergens, are common to the climate of Tidewater, Virginia, albeit O'Donnell's reactions are alleged to be more severe.

edge of [O'Donnell's] duties and his working conditions." *See Harmer v. Virginia Elec. And Power Co.*, 831 F.Supp. 1300, 1307 (E.D.Va.1993). Dr. Eng states in his deposition that he had no knowledge of the air quality in O'Donnell's building aside from the information that was provided by O'Donnell. *See id.* Nor did Dr. Eng have any evidence that O'Donnell's symptoms were the result of allergens at work, at home, or both, other than O'Donnell's own fears and speculations. In fact the company testing demonstrated a greater air quality problem existed O'Donnell's prior office in Building 161, than in his new office in Building 29.

Before moving O'Donnell from Building 161 to Building 29 in April, 1994, Dr. Reid called Dr. Eng and explained that the Company planned to move O'Donnell. Dr. Eng told Dr. Reid that he knew of no reason why it was medically necessary for O'Donnell to remain in Building 161, but that O'Donnell preferred to stay there and that if his condition worsened, other alternatives would need to be considered. (Eng. Tr. at 117–122.) Dr. Reid informed Dr. Eng of the reason for the move and agreed to reconsider things if O'Donnell's condition worsened. (*Id.*)

■ Second, placing O'Donnell on short term leave while improving the air quality in Building 29 was reasonable accommodation. After moving to Building 29, O'Donnell complained to Dr. Eng of a cycle of symptoms which O'Donnell associated with his work week. O'Donnell was tested for allergies and had the air filter from Building 29 tested. O'Donnell discussed these test results and his symptoms with Dr. Eng, and requested another letter. Dr. Eng wrote another letter expressing his concern and suggesting a test period away from work so that the cause of O'Donnell's allergies might be isolated. However, these letters did not go to the Company as Dr. Eng expected, but were attached to O'Donnell's OFCCP Complaint.

Once the Company received all the information contained in O'Donnell's OFCCP Complaint it took extraordinary measures to accommodate O'Donnell. The Company contacted Dr. Eng and requested a recommended course of action to correct the problem. Dr. Eng recommended that O'Donnell either "be moved from his current environment or be placed on temporary leave until his current situation [could] be environmentally rectified." (O'Donnell Ex. 26.) Accordingly, the Company placed O'Donnell on short-term disability and took numerous measures to insure that the air quality was improved.

■ The EEOC maintains that these accommodations were not reasonable since the Company could have simply moved O'Donnell back to Building 161. However, the Company is not required to provide O'Donnell with the specific "accommodation he may request, but only with reasonable accommodation as is necessary to enable him to perform his essential functions." *Harmer*, 831 F.Supp. at 1306 (citations omitted). The Guidelines implementing the ADA include within their definition of reasonable accommodation, "[m]odifications or adjustments to the work environment ... that enable a qualified individual with a disability to perform the essential functions of that position...." 29 C.F.R. § 1630.2(*o*)(ii) (1995).

The tests the Company conducted on the air filters indicated that the level of aspergillus niger was actually higher in Building 161 than Building 29. While it would have been easier for the Company to move O'Donnell back into Building 161, considering that O'Donnell attributed his health problem to the presence of this allergen, it would have been illogical and counterproductive to do so. Instead, the Company set about correcting the underlying problems and improving the air quality.

At the October 31, 1996 hearing on this motion, counsel for the EEOC, lacking facts to give rise to a legitimate issue, presented an emotional appeal explaining that O'Donnell's fears are reasonable considering his belief that his allergies might lead to an opportunistic infection which in turn might kill him. The Court **FINDS** such an emotional appeal inappropriate and the argument unsupported by the record. None of O'Donnell's physicians have indicated that his allergies in any way endanger his life, nor has O'Donnell claimed that his life is threatened by sinus problems, although he does claim a

reduction in his responsibilities has damaged his self esteem and that this is life threatening. In fact, Dr. Oldfield's expert report indicated that O'Donnell has never experienced an opportunistic infection associated with HIV (Pl.'s Ex 3), he does not have acquired immunodeficiency syndrome ("AIDS"), and his immune systems ability to fight off infections is within the normal range. (Eng Tr.˙at 57–58.) Considering the information provided to it by O'Donnell, his employer has made efforts to accommodate him well beyond that which reasonableness requires. There is no material fact in dispute upon which a jury could find that the company did not reasonably accommodate O'Donnell.

### IV. Conclusion.

Persons having a legitimate disability are entitled to the protections of the ADA. While there is a genuine issue as to whether O'Donnell is disabled within the meaning of the ADA, the EEOC has failed to rebut the employer's proffered evidence of reasonable accommodation, and therefore, the Court limits its findings to the accommodation element.

One of the principal purposes of the ADA is to encourage employers to accommodate legitimately disabled employees. In this case the employer has extended more than reasonable efforts to accommodate O'Donnell. Against a background where many employers isolate, ostracize or discharge HIV positive employees, we observe this employer maintained a dialogue with O'Donnell's physician, followed his recommendations and made numerous improvements to O'Donnell's work environment.

At some point an employer's efforts to accommodate must be deemed reasonable as a matter of law. The EEOC has failed to proffer evidence to rebut the employer's proffered evidence of reasonable accommodation, instead it has based its position upon a faulty interpretation of the record. If the evidence proffered in this case does not establish reasonable accommodation as a matter of law, then this Court fears that no employer could meet the standard, and employers would thereby be discouraged from voluntarily attempting to accommodate those genuinely disabled.

For the aforementioned reasons, the defendant's Motion for Summary Judgment is **GRANTED.**

The Clerk is **REQUESTED** to send a copy of this Order to counsel for both parties.

It is so **ORDERED.**