911 P.2d 1319 (1996)
128 Wash.2d 618
Evelyn FELL; Jean Toews; Dianna Bailey; Don Howley; Hazel Proost; Richard Arundell; Paul Clements; Howard Bolton; and Coalition of the Responsibly Disabled, Respondents,
v.
SPOKANE TRANSIT AUTHORITY, a municipal corporation, Appellant.
No. 61385-1.
Supreme Court of Washington, En Banc.
February 29, 1996.
Reconsideration Denied May 9, 1996.
*1320 Perkins Coie, Thomas F. Kingen, James P. McNeill, III, Spokane, for appellant.
Lonnie G. Davis, Seattle, Lawrence Weiser, Spokane, for respondents.
TALMADGE, Justice.
The Spokane Transit Authority (STA), a public transit agency, adopted a new plan for paratransit service for the disabled and the elderly in 1992. The plan apparently complied with the specific provisions on paratransit *1321 services set forth in the Federal Americans With Disabilities Act (ADA). Although the overwhelming majority of users of paratransit services continued to receive services under the new plan, the plaintiff class did not. They sued for an injunction prohibiting implementation of the new plan, claiming discrimination against the disabled in violation of RCW 49.60.215. On summary judgment, the trial court ruled the plaintiffs were entitled to judgment as a matter of law on their claim for discrimination in public accommodations under our State's antidiscrimination law because STA failed to demonstrate that the service was "no longer reasonably possible." Because the trial court failed to incorporate comparability of treatment into its analysis under RCW 49.60.215, we reverse and remand the case for trial.

ISSUES
1. What is a place of public accommodation under RCW 49.60.215?
2. What is the test to establish a claim of discrimination in a place of public accommodation under RCW 49.60.215?
3. Did the trial court here err in granting summary judgment to plaintiffs under RCW 49.60.215 where the paratransit plan established by STA conformed to the requirements of ADA and the plaintiffs did not establish as a matter of law that they had not been treated in a fashion comparable to nondisabled persons?

FACTS
Prior to 1992, the STA offered paratransit service, an arranged service for aged and disabled persons, throughout its service area. Paratransit service was STA's most expensive service; fares accounted for only five percent of the actual cost of the service. Though paratransit service costs more to operate than fixed route service, paratransit users paid a lesser fare than fixed route customers.
In 1991, Congress passed the ADA. STA then began development of a comprehensive paratransit plan to conform with the provisions of ADA. STA involved the public in the adoption of the plan through a core committee, extensive public workshops and public hearings, and televised public hearings. STA sent notices to individuals affected by the proposed plan.[1] Ultimately, STA adopted a new paratransit plan on January 23, 1992, providing for paratransit services within an area three-quarters of a mile around the fixed routes already operated by STA, with certain exceptions to that rule. The service was provided only to those who were unable to utilize the fixed route system; age or disability alone did not entitle a person to paratransit service. Ninety-nine percent of the people previously using paratransit services were served under STA's new paratransit plan.
The STA paratransit plan conformed to the United States Department of Transportation (DOT) regulations adopted pursuant to the ADA.[2] (Clerk's Papers at 283.) Apart from a van pool service operated by private citizens with STA equipment, STA made no specific provision for service to nondisabled individuals residing outside of the area of the fixed routes operated by STA. The van pool was available to the disabled. Further, STA made a significant effort to provide an accessible fleet of buses within the corridors.[3]
Although plaintiffs had the opportunity to participate, and did participate, in the deliberations *1322 of STA regarding the adoption of the paratransit plan, some 20 months after STA's adoption of the paratransit plan they filed suit for injunctive and declaratory relief, arguing that STA's denial of direct paratransit service to them violated RCW 49.60 and WAC 162-26.[4] The parties stipulated to certain facts before the trial court, and the trial court granted a permanent injunction against STA's paratransit plan.
STA stipulated it had the physical and financial means to provide the service to plaintiffs.[5] The plaintiffs stipulated STA's actions were not arbitrary and capricious. The plaintiffs conceded the paratransit system provides greater service than that afforded the general public. (Clerk's Papers at 282.) Nevertheless, the trial court issued an injunction against STA's paratransit plan because, although STA's delineation of service corridors was within its authority and "pursuant to federal guidelines," STA had failed to show the prior service was "no longer reasonably possible."[6]

ANALYSIS
A. STANDARD OF REVIEW FOR SUMMARY JUDGMENT
It is well settled under Washington law that this court reviews a summary judgment de novo, treating all facts and inferences therefrom in a light most favorable to the nonmoving party. Mountain Park Homeowners Ass'n v. Tydings, 125 Wash.2d 337, 341, 883 P.2d 1383 (1994).
Notwithstanding the parties' stipulation, this court must determine if there were genuine issues of material fact below and the plaintiffs were entitled to judgment as a matter of law. CR 56(c). In fact, the parties' stipulation did not resolve the issues of material fact, facts upon which the outcome of this case (given the proper analytical framework) depended. Clements v. Travelers Indem. Co., 121 Wash.2d 243, 850 P.2d 1298 (1993). At least some of these questions of material fact were articulated below by the plaintiffs.[7]
Moreover, plaintiffs never demonstrated that they were entitled to judgment as a matter of law because the trial court improperly analyzed a case of disability discrimination in public accommodations under RCW 49.60.215. In particular, the trial court found that although STA complied with "federal guidelines" in its plan, it failed to show that prior service was no longer "reasonably possible." Nowhere in the entire jurisprudence of RCW 49.60 since its enactment in 1949 is such a legal standard to be found. A "reasonably *1323 possible" test for a case of discrimination in public accommodations is without precedent under Washington law, and creates a flawed analytical framework for deciding RCW 49.60.215 issues. In particular, the trial court's formulation of the test transforms an antidiscrimination statute into an entitlement statute and offers no principled limit to the reach of the statute. Our task is to formulate a workable analytical framework for a claim of disability discrimination in places of public accommodation under RCW 49.60.215.
B. WASHINGTON LAW AGAINST DISCRIMINATION
The starting point in the analysis of this case lies in the construction of the various statutes and regulations that apply to the decisionmaking of the STA with respect to service to disabled individuals. RCW 49.60.030 generally bans discrimination on the basis "of any sensory, mental, or physical disability." RCW 49.60 does not define "discrimination,"[8] but RCW 49.60.030(1)(b) provides that the right to be free from discrimination extends to the "right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement."[9] It is an unfair practice to discriminate in matters of public resort or accommodation "except for conditions and limitations established by law and applicable to all persons, regardless of ... the presence of any sensory, mental, or physical disability." RCW 49.60.215. RCW 49.60 is an antidiscrimination statute, as the Legislature stated in RCW 49.60.010.
The Human Rights Commission adopted regulations in WAC 162-26 to effectuate the policy of RCW 49.60, but did not adopt specific standards with respect to public transportation.[10] The Commission has approached this issue with only general standards on public accommodations. In WAC 162-26-060, the Commission stated that RCW 49.60.215 is best satisfied when disabled persons are treated as if they were not disabled, i.e., when the public entity provides "the same service" to the disabled as it provides to the nondisabled.[11] The policy of RCW 49.60, however, can be satisfied where the same service is not provided, if "reasonable accommodation" is made for the disabled person's disability. As a final, and least acceptable alternative, RCW 49.60 may be satisfied if an arranged service is offered for the disabled person. WAC 162-26 specifically references sections 503 and 504 of the United States Rehabilitation Act of 1973, 29 U.S.C. §§ 793, 794, *1324 but makes no reference to the ADA or the regulations adopted thereunder.
C. THE ADA AND FEDERAL DOT REGULATIONS
In contrast to Washington's vague standards, the federal standards for treatment of the disabled are specific; they are more in the nature of entitlements. ADA's protection is not even conditioned upon a finding of "discrimination," as is true under RCW 49.60. Helen L. v. DiDario, 46 F.3d 325 (3d Cir.1995).[12]
The ADA addresses discrimination in public transportation by requiring public transit agencies operating fixed route systems to provide paratransit and other special service transportation to disabled persons on a comparable level to the service provided for nondisabled users. 42 U.S.C.A. § 12143(a) (1995).[13]
DOT adopted very explicit regulations to define precisely what agencies must do to provide comparable services to disabled persons.[14]See 49 C.F.R. §§ 37.121-37.173 (1994). DOT noted in adopting the regulations that paratransit service was "not intended to be a comprehensive system of transportation for individuals with disabilities." 56 Fed.Reg. 45,601 (1991). DOT emphasized comparability of service for the disabled: "The ADA does not attempt to meet all the transportation needs of individuals with disabilities ... [T]he ADA is intended simply to provide to individuals with disabilities the same mass transportation service opportunities everyone else gets, whether they be good, bad, or mediocre." 56 Fed. Reg. 45,601 (1991). The DOT regulations define the paratransit service corridor as three-quarters of a mile on either side, and at the end, of each fixed route. 49 C.F.R. § 37.131(a)(1)(i) (1994). Transit agencies are not required to provide paratransit services outside the boundaries in which they operate. 49 C.F.R. § 37.131(a)(3) (1994). The regulations also provide that the fares for paratransit service may be up to twice the fare for a similar trip on a fixed route.[15] The federal courts defer to the federal agency interpretation of the statute. Americans Disabled for Accessible Pub. Transp. (ADAPT) v. Skinner, 881 F.2d 1184, 1193 (3d Cir.1989) (mainstreaming, as opposed to mix of accessible transit and paratransit, not required to satisfy federal law).
The ADA provides that local transit entities must provide paratransit services to the extent that providing such services would not impose an undue financial burden on such entities. 42 U.S.C.A. § 12143(c)(4) (1995). DOT regulations further refine this exception to paratransit service by setting forth a number of factors including the operational and financial impacts of providing paratransit service. 49 C.F.R. § 37.155 (1994). The local entity must affirmatively seek a waiver of paratransit service due to financial burden. 49 C.F.R. § 37.151 (1994).[16]
*1325 Plainly, the federal standards for paratransit service for the disabled are far more explicit than those found in RCW 49.60 or the Human Rights Commission regulations, in which paratransit is not even mentioned. At peril of lawsuits under RCW 49.60, STA was obliged to choose between the very general state antidiscrimination standard or the very explicit federal entitlement in developing a paratransit plan.
D. ANALYTICAL FRAMEWORK FOR A CASE UNDER RCW 49.60.215
The question of the test for discrimination against the disabled in places of public accommodation is one of first impression in Washington. Federal cases interpreting the scope of the ADA offer little help. As one federal district court noted, because the ADA is so recent, there is a paucity of case law on the burden of proof under the act. United States v. Morvant, 898 F.Supp. 1157, 1160 (E.D.La.1995). See Mayberry v. Von Valtier, 843 F.Supp. 1160, 1166 (E.D.Mich.1994) (adopting McDonnell Douglas test in case of discrimination against disabled in public accommodations).
Plainly, the trial court's test of "reasonably possible" is unworkable. We do not agree that simply because STA stipulated it had the financial wherewithal to provide the services it eliminated in its new paratransit plan, STA violates the Law Against Discrimination if it does not provide those services.[17] Because it lacks a comparability test, the trial court's opinion may stand for the proposition that an agency violates RCW 49.60 if it fails to provide services to disabled people in excess of the services it provides to the nondisabled. Such a determination is more appropriately left to the legislative and executive branches. The Legislature designed RCW 49.60 to prevent discrimination in a variety of fields, i.e., to remove barriers to equal opportunity in our society. The statute was not intended to entitle certain protected classes to some unspecified type and unlimited level of services. Absent the touchstone of comparable treatment, there is no limiting principle to the reach of RCW 49.60.215. Society can always provide more services to the protected classes under the statute, but the question is when the failure to do so constitutes discrimination.[18] Financial *1326 ability to provide a service is not enough. There must also be a finding of discrimination. Because the claim arises from the antidiscrimination statute, it follows naturally as a matter of sound legal analysis that we must analyze the discrimination claim in this case as we analyze other discrimination claims under RCW 49.60.
A logical starting point at which to begin the analysis of discrimination against the disabled in places of public accommodation is a case of discrimination against the disabled in employment.[19]Holland v. Boeing Co., 90 Wash.2d 384, 583 P.2d 621 (1978), involved a Boeing employee who suffered with cerebral palsy since birth. Despite his illness, which manifested itself in spontaneous muscular contractions over various parts of his body, he had worked for Boeing for over 20 years. He progressed from a Grade 5 Storekeeper to a Grade 9 Electronics Technician. His disability did not prevent him from performing his tasks as an electronics technician. Id. at 386, 583 P.2d 621. In 1974, Boeing reassigned Holland to a position of equal pay grade that required more manual dexterity than he could manage. Boeing supervisors began documenting his inability to perform in his new job. Eventually, he was asked to accept a reassignment and a reduction in pay grade. Having spent 22 years advancing himself, Holland objected to the downgrade. Id. at 386, 583 P.2d 621. Boeing ultimately assigned Holland to a Grade 5 Storekeeping position, the same position he had at the outset of his employment with Boeing 22 years previously. He sued. When the case reached this court, we held that in order to make applicable the Legislature's prohibition of handicap discrimination, the employer had to take "positive steps," holding that it "is an unfair practice for an employer to fail or refuse to make reasonable accommodations to the physical limitations of handicapped employees." Id. at 389, 583 P.2d 621.
This court elaborated on the Holland theme in Dean v. Municipality of Metropolitan Seattle-Metro, 104 Wash.2d 627, 708 P.2d 393 (1985). Dean was a Metro bus driver who lost his job when he became blind in one eye due to a disease. We concluded that Metro had not affirmatively assisted Dean to find another position with Metro, and therefore failed to make the reasonable accommodation of Dean's handicap the law required. The Dean court said:
We hold that to make a prima facie case of handicap discrimination an employee plaintiff must prove that he or she is handicapped, that he or she had the qualification required to fill vacant positions and that the employer failed to take affirmative measures to make known such job opportunities to the employee and to determine whether the employee was in fact qualified for those positions.
Id. at 639, 708 P.2d 393. Dean is noteworthy for its rejection of the McDonnelle Douglas elements for a prima facie case of employment discrimination, distinguishing that case from Dean because it involved a failure to *1327 hire, rather than a failure to reasonably accommodate a disability that developed in an already-employed worker.[20]Id. at 637, 708 P.2d 393.
Although Dean employed a different test for stating a prima facie case, it adopted the McDonnell Douglas burden-shifting approach for determining disability discrimination in employment: (1) worker must make a prima facie case by a preponderance of the evidence; (2) the burden is then upon the employer to produce a legitimate non-discriminatory reason for the challenged act; and (3) the burden then shifts to the worker to show the employer's claimed reasons are pretext. Dean, 104 Wash.2d at 637, 708 P.2d 393 (citing McDonnell Douglas, 411 U.S. at 802-04, 93 S.Ct. at 1824-25). Accord Reese v. Sears Roebuck & Co., 107 Wash.2d 563, 579, 731 P.2d 497 (1987) ("Once an individual establishes a prima facie case of handicap discrimination, the burden shifts to the employer, who must demonstrate some non-discriminatory reason for the refusal to hire or to accommodate"), overruled on other grounds by Phillips v. City of Seattle, 111 Wash.2d 903, 766 P.2d 1099 (1989). Inherent in these cases is the necessity for the plaintiff to make a showing of discrimination.
The prohibition against discrimination stems from the constitutional requirement for equal protection. U.S. CONST. amend. XIV, § 1 (Equal Protection Clause); WASH. CONST. art. I, § 12 (privileges and immunities, and equal protection).
The aim and purpose of the special privileges and immunities provision of Art. I, § 12, of the state constitution and of the equal protection clause of the fourteenth amendment of the Federal constitution [are] to secure equality of treatment of all persons, without undue favor on the one hand or hostile discrimination on the other.
State ex rel. Bacich v. Huse, 187 Wash. 75, 80, 59 P.2d 1101 (1936), overruled on other grounds by Puget Sound Gillnetters Ass'n v. Moos, 92 Wash.2d 939, 603 P.2d 819 (1979). "Equal protection of the laws ... forbids all invidious discrimination." Aetna Life Ins. Co. v. Washington Life & Disability Ins. Guaranty Ass'n, 83 Wash.2d 523, 528-29, 520 P.2d 162 (1974); accord City of Everett v. Fire Fighters, Local No. 350, 87 Wash.2d 572, 576, 555 P.2d 418 (1976). "[S]tatutes do not offend [the federal or state constitutions] unless they are invidiously discriminatory." Northshore Sch. Dist. No. 417 v. Kinnear, 84 Wash.2d 685, 722, 530 P.2d 178 (1974), overruled on other grounds by Seattle Sch. Dist. No. 1 v. State, 90 Wash.2d 476, 585 P.2d 71 (1978). Thus, it follows naturally that to "show a violation of the equal protection clause, a party must first establish that the challenged act treats unequally two similarly situated classes of people." Cosro, Inc. v. Liquor Control Bd., 107 Wash.2d 754, 760, 733 P.2d 539 (1987). "Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed." Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971) (discussing Title VII of the Civil Rights Act of 1964) (emphasis added). We conclude that an essential element of any test for disability discrimination in a place of public accommodation under RCW 49.60.215 is the presence of actual discrimination against the protected class.
For example, the statute requiring paratransit services under the ADA declares discrimination to be present only when the agency does not provide a level of service to the disabled "which is comparable to the level of designated public transportation services provided to individuals without disabilities." 42 U.S.C.A. § 12143(a)(1) (1995). Put another way, there is discrimination only when the disabled are not provided with comparable services. It is this *1328 comparability element that is an essential ingredient in the test for discrimination against the disabled under RCW 49.60.215.
Washington case law on other kinds of discrimination in public accommodations, like the ADA, looks to comparability of treatment. In Evergreen Sch. Dist. No. 114 v. Washington State Human Rights Comm'n, 39 Wash.App. 763, 777, 695 P.2d 999 (1985), a racial discrimination case under RCW 49.60.215, the Court of Appeals stated with respect to RCW 49.60.215: "The statute's primary thrust is to the refusing or withholding of admission to places of public accommodation, and the use of their facilities on an equal footing with all others." In that case, the court noted that the treatment of people, not people's subjective feelings, was the basis for discrimination. Id. at 772-73, 695 P.2d 999. See also MacLean v. First Northwest Indus. of Am., Inc., 96 Wash.2d 338, 349, 635 P.2d 683 (1981) (Utter, J., dissenting) ("Their purpose [public accommodation laws] `is to make equal access to [public] places ... a public right'") (sex discrimination).
To meet the test of comparable treatment, the law should not require mathematical precision, particularly in the area of public accommodations where there is a need to afford some latitude to governments and businesses in achieving the goal of comparable treatment.[21] If the public accommodation is synonymous with the entire service area of the governmental unit and comparable treatment is not the analytical touchstone, there is no basis upon which a governmental body or a business could not do more to provide services to a disabled person. There is no principled basis for a governmental body ever to reduce or adjust services. To agree with the plaintiffs' approach would be to effectively legislate an unrestricted right to services. The certain result would be endless litigation over alleged service entitlements, with the decision as to how an agency must allocate its resources left to the judiciary, the branch of government by design furthest removed from the will of the people.
In summary, we hold the plaintiffs must prove the following in order to make out a prima facie case under RCW 49.60.215:
(1) they have a disability recognized under the statute; (2) the defendant's business or establishment is a place of public accommodation; (3) they were discriminated against by receiving treatment that was not comparable to the level of designated services provided to individuals without disabilities by or at the place of public accommodation;[22] and, (4) the disability was a substantial factor causing the discrimination.
While the last element is strictly a question of fact, the other three are mixed questions of fact and law. In a case where the facts are either undisputed or where reasonable minds would not differ about them, a court could decide the presence or absence of the first three elements as a matter of law. Applying this analysis to the facts of this case demonstrates plaintiffs were not entitled to summary judgment.
1. DISABILITY
While the existence of a disability is a question of fact, Phillips v. City of Seattle, 111 Wash.2d 903, 766 P.2d 1099 (1989) (alcoholism is not a disability), the parties here agreed that the plaintiffs are disabled.[23]
*1329 2. PLACE OF PUBLIC ACCOMMODATION
The parties agree that public transit is a "public accommodation."[24] The plaintiffs argue, however, that the relevant place of public accommodation is the entire service area of the STA. This is an expansive view not supported by RCW 49.60.040(10), which defines a place of public accommodation as park and ride lots, bus shelters, transit centers and buses on scheduled fixed routes. RCW 49.60.040(10) makes it very clear that the reach of the statute extends to places and facilities, not services.
The plaintiffs define a place of a public accommodation under RCW 49.60 as follows: "[A] place of public accommodation is wherever public transportation is provided.... STA is clearly considered a place of public accommodation as defined by RCW 49.60.040." (Br. of Resp't at 9.) We disagree. The statute speaks to places and facilities. A service like paratransit service is not a place or facility.[25] Titles II and III of the ADA, for example, distinguish services from places of public accommodation.
The plaintiffs' proposed definition carries extraordinary implications. The service area for a unit of government would now become the entire jurisdictional or geographic boundary of the governmental unit. Currently, a municipality may provide services to its constituents at fixed points. But no matter how remote the residence of the disabled person from the fixed point of governmental services, under the plaintiffs' view, government must, in effect, go to that disabled individual and provide service.[26] This view has profound and unsettling implications for such fixed point services as libraries, schools, and other services traditionally provided at specific locales. A similar reach may be present for private sector enterprises providing public accommodations, were we to adopt the plaintiffs' definition of a place of public accommodation.
The question of what constitutes STA's "place of public accommodation" is appropriately a question of fact for the trier of fact, rather than a question for this court. What must be very clear, however, is that the statutory mandate to provide access to places of public accommodation is not a mandate to provide services.[27] While entitlement to services may be in the ADA, the Legislature has not enacted a counterpart to the ADA in Washington creating such entitlements.[28]
3. DENIAL OF COMPARABLE SERVICES
A key issue in this case is whether STA denied the plaintiffs services comparable to those of nondisabled people. STA's *1330 fixed routes and its paratransit plan involve a facially neutral means of providing transit services in Spokane. Nondisabled individuals outside STA's fixed route service areas generally do not receive services and must access fixed routes by whatever means available to them. By requiring STA to offer paratransit services to disabled persons who live more than three-quarters of a mile from fixed routes, the plaintiffs' approach might thereby effectively require STA to offer greater service to disabled people than is available to nondisabled people. We cannot find a basis for that requirement in Washington's Law Against Discrimination. Rather, the test is comparability of treatment, as described supra. This is an issue for the trial court to determine.
4. CAUSATION
RCW 49.60.215 provides, in pertinent part: "It shall be an unfair practice for any person or the person's agent or employee to commit an act which directly or indirectly results in any distinction, restriction, or discrimination... except for conditions and limitations established by law and applicable to all persons, regardless ... of any sensory, mental, or physical disability...." Thus, there must be some causal nexus between the act complained of and the resulting discrimination in order for the act to be an unfair practice under RCW 49.60.215. The causation requirement is based on the commonsense notion that if the alleged discrimination results from factors other than anything the defendant did, the defendant has not violated the Law Against Discrimination.
We recently held in Mackay v. Acorn Custom Cabinetry, Inc., 127 Wash.2d 302, 898 P.2d 284 (1995), that "in order to prevail on [a claim of employer retaliation] plaintiff must prove that an attribute listed in RCW 49.60.180(2) was a `substantial factor' in an employer's adverse employment decision." Id. at 310, 898 P.2d 284. Accordingly, to promote harmony in our discrimination law jurisprudence, the proper causation test for disability discrimination in places of public accommodation is that the alleged unfair practice was a substantial factor in producing the alleged discrimination.
The causation element of a prima facie case under RCW 49.60 has been a significant factor in recent court decisions. Even under older cases like Finnesey v. Seattle Baseball Club, 122 Wash. 276, 210 P. 679, 30 A.L.R. 948 (1922), the principle of causation was essential to a claim of discrimination. In Finnesey, the plaintiff was allegedly excluded from a ball park on the basis of race. In fact, the plaintiff was excluded because he had fixed the outcome of games. Finnesey, 122 Wash. at 278-79, 210 P. 679.
In Klein v. Boeing Co., 847 F.Supp. 838 (W.D.Wash.1994), the court held that an individual who entered a deferred prosecution for a sexual crime involving a child and was fired by his employer failed to establish a prima facie case under RCW 49.60. The plaintiff argued that he had a mental condition and was terminated by his employer because of that condition. The court, however, noted that the employer had a clear policy allowing for termination of employees convicted of crimes. The employee was discharged, not because of his disability, but because of his violation of the employment standard.
Similarly, in Jane Doe v. Boeing Co., 121 Wash.2d 8, 846 P.2d 531 (1993), we declined to define gender dysphoria or transsexualism as a handicap under RCW 49.60. We did, however, state that an individual who wore feminine attire in violation of an employer work rule was not discharged because of the alleged handicap, but because of the refusal to conform with employer directives on acceptable attire, which were facially neutral.[29]
The question of whether a person's disability was a substantial factor in the alleged discrimination, like other matters of proximate causation, is a question of fact. See, e.g., Hartley v. State, 103 Wash.2d 768, 777-81, 698 P.2d 77 (1985). The plaintiffs *1331 will have the opportunity on remand to establish causation under the substantial factor test.[30]
5. STA'S LEGITIMATE, NONDISCRIMINATORY REASON FOR ITS ACTION
Assuming the plaintiffs establish a prima facie case of discrimination in public accommodations, in keeping with the McDonnell Douglas protocol, the burden would then shift to STA to show a non-discriminatory reason for its actions. In the present case, STA arguably met this burden when it proved it undertook a public process to adopt a comprehensive paratransit plan and adopted a plan required by ADA and the DOT regulations.
Compliance by STA with the ADA and the DOT regulations adopted thereunder and could constitute a legitimate, non-discriminatory reason for STA's actions, sufficient to shift the burden to the plaintiffs to demonstrate that STA's actions were a mere pretext for discrimination.[31] In another case, a defendant may advance financial unfeasibility as a legitimate nondiscriminatory reason for its action.
6. PRETEXT
The question of pretext is generally a question for the trier of fact when there are competing inferences of discrimination in a case. Sellsted v. Washington Mut. Sav. Bank, 69 Wash.App. 852, 851 P.2d 716, review denied, 122 Wash.2d 1018, 863 P.2d 1352 (1993).[32] The plaintiffs will have the opportunity on remand to conduct appropriate discovery and prove, if possible, that STA's reliance on the ADA was a mere pretext for discrimination. Kastanis v. Educational Employees Credit Union, 122 Wash.2d 483, 494-95, 859 P.2d 26, 865 P.2d 507 (1993) (plaintiffs' burden is to prove intentional discrimination by the defendant once the burden-shifting scheme is satisfied).[33]See Jones v. Kitsap Cy. Sanitary Landfill, Inc., 60 Wash.App. 369, 803 P.2d 841 (1991) (race); Pannell v. Food Servs. of Am., 61 Wash.App. 418, 810 P.2d 952, 815 P.2d 812 (1991) (age), review denied, 118 Wash.2d 1008, 824 P.2d 490 (1992); Carle v. McChord Credit Union, 65 Wash.App. 93, 827 P.2d 1070 (1992) (age). See also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

CONCLUSION
Effusive praise greeted the passage of the Americans with Disabilities Act of 1990. Former Attorney General of the United States Dick Thornburgh called the ADA "a great leap forward in the civil rights movement."[34] United States Senator Pete Domenici said, "The ADA will encourage the *1332 modern-day Churchills and Van Goghs to make the most of their talents."[35] Lead Senate sponsor Senator Tom Harkin called the ADA a "20th-century Emancipation Proclamation for people with disabilities."[36] Title II of the ADA, dealing with public transportation, is a "major hub" of the ADA.[37] Given the fanfare that greeted the ADA, the section of the ADA requiring paratransit service, and the lengthy implementing regulations, it is not clear why the plaintiffs believe Washington's Law Against Discriminationwhich does not contain the word paratransit or the concept of providing paratransit service for the disabledprovides a basis for a discrimination lawsuit in a plan that apparently complies with the ADA.
Because of its significant policy and fiscal consequences for government and private businesses, a case of discrimination against the disabled virtually demands a clear analytical framework to assess the reach of the Law Against Discrimination. The trial court did not provide such a framework. Instead, the trial court appeared to react with understandable sympathy to the circumstances of 132 disabled people in Spokane, and by its judgment converted RCW 49.60.215 from an antidiscrimination statute into an entitlement statute. We decline to do so in the absence of specific legislative direction.
We reverse the judgment of the trial court and remand this case for trial of the factual issues compelled by the analytical framework we have set forth in this decision for a claim of discrimination in public accommodations.
DURHAM, C.J., SMITH and JOHNSON, JJ., and UTTER, J. Pro Tem., concur.
SANDERS, J., did not participate.
MADSEN, Justice, dissenting.
There are three major reasons why the majority opinion should be rejected. First, its effect is to nullify state law. Second, it misrepresents both the trial court's ruling and the applicable statutes and regulations. Third, it represents a giant step backward for the disabled people in this State, contrary to broad legislative enactments protecting their rights. I dissent.
Turning to the first of these problems, once the majority is distilled, what remains is a remarkable conclusion: Forget the state statutes and implementing regulations there is no independent state law ensuring the disabled the right to full enjoyment of places of public accommodation.
The majority reaches this unfortunate conclusion by collapsing state law provisions into the Federal Americans With Disabilities Act (ADA). If the plaintiff shows a prima facie case of discrimination, the majority says, the place of public accommodation can justify its discrimination on the basis it has complied with the ADA. Majority at 1328. Unless the plaintiff can prove pretext, the majority says, plaintiff loses. But compliance with the federal law is mandatory, and it would be all but impossible for a plaintiff to prove that action taken to bring a place of public accommodation into compliance with the ADA is a pretext masking a violation of civil rights or discrimination in violation of state law. Bottom linecompliance with the ADA is all that is required. Washington law is completely irrelevant.
I do not agree that our State's legislation should be so casually dismissed. Our State law in this area preceded the ADA. Nothing suggests any legislative intent that the state law, as enacted, was to be displaced by future federal enactments. In short, despite a great detour into federal law by the majority, the issue here is what is required under the state statutes and their implementing regulations. Regardless of whether there is compliance with the ADA, the issue is whether there has been compliance with state law. This court should not abrogate state law.
The second problem with the majority is that it misreads both state law and the trial court's decision, thus leading to its alarmist message that the disabled might take more than "their share" under reasoning like that of the trial court. Despite the *1333 majority's implicit retrogression into an "us versus them" mentality, there is nothing untoward about the trial court's reasoning.
As the majority explains, there are three means by which service may be provided to the disabled by places of public accommodation: same service, reasonable accommodation, and arranged service. WAC 162-26-060.[1] Same service has never been an issue in this case. Plaintiff argued to the trial court applicability of both reasonable accommodation and arranged service. While the trial court agreed that the paratransit service is arranged service, it applied a "reasonably possible" standard expressly applicable to reasonable accommodation but not mentioned in the WACs relating to arranged service. Clerk's Papers at 299, 300-01 (trial court's memorandum decision); see WAC 162-26-080(2) (reasonable accommodation, requiring action "reasonably possible" in the circumstances); WAC 162-26-090 (arranged service).
Nevertheless, the majority's agitation over a "reasonably possible" standard is unwarranted for two reasons. First, contrary to the majority's expostulation, the principle has a settled place in this State's antidiscrimination jurisprudence. Second, while the WACs regarding arranged service do not refer to "reasonably possible," it is obvious that they encompass such a reasonableness standard.
While the term "reasonably possible" is not found in the statutes, it is consistent with the accommodation required in an employment setting. In Holland v. Boeing Co., 90 Wash.2d 384, 583 P.2d 621 (1978), upon which the majority itself relies, this court held that an employer must affirmatively act to reasonably accommodate a disabled employee. The court specifically noted that unlike other forms of discrimination which might be eradicated through identical treatment, often disability discrimination can be eradicated only through different treatment. Id. at 388, 390 n. 4, 583 P.2d 621.
The Human Rights Commission has expressly incorporated the Holland standard as a source of guidance into WAC 162-26-080, which pertains to reasonable accommodation by a place of public accommodation. WAC 162-26-080(5). The term "reasonably possible" does not mean, as the majority misleadingly says, that an antidiscrimination statute is turned into an entitlement statute without limits. Majority at 1322. It is, instead, part of the definition of "reasonable accommodation," which means "action, reasonably possible in the circumstances, to make the regular services of a place of public accommodation accessible to persons who otherwise could not use or fully enjoy the services because of the person's sensory, mental, or physical limitations." WAC 162-26-080(2) (emphasis added).
Plainly, the "reasonably possible" standard is not the wide-open, unlimited standard the majority announces. I can only speculate that the majority fans the fears of unlimited service at unlimited cost to justify its unconscionable narrowing of Washington law.
While the trial court applied the "reasonably possible" language of WAC 162-26-080 to arranged service within the meaning of WAC 162-26-090, it nevertheless reached the right result. The trial court correctly determined that the paratransit service is arranged service. Arranged service "means making the services or goods of a place of public accommodation available to a [disabled] person at a place or in a way that is different from the place or way that the service is offered to the public in general, in order to serve the person." WAC 162-26-090(2). Arranged service is the least desirable of the methods of service, with same service, and reasonable accommodation required, if possible, in that order. WAC 162-26-060; WAC 162-26-090(3) ("[a]rranged service is fair only when neither same service nor reasonable accommodation is possible, and the choice is between arranged service *1334 and no service"). Whichever method of service is provided, the overall objective is the assurance that the disabled "will have the enjoyment of places of public accommodation to the greatest extent practical." WAC 162-26-060(4). There is, therefore, no lesser standard of compliance with State law, or lesser accommodation appropriate, merely because arranged service is the only possible means of accommodation. The statutory goal in all cases is for the disabled to have the same full enjoyment of services as the general public has.
Arranged service requires that "[a]mong available means or places, the one that most closely approximates service to the general public should be chosen." WAC 26-62-090(4). The place and means may be chosen by the operator of a place of public accommodation, "so long as the operator gives reasonable weight to the convenience, needs, and dignity of the [disabled] person seeking service." WAC 162-26-090(4). This does not mean that the operator may choose what service to provide, because RCW 49.60.030 and .215 mandate the service which must be provided (as closely approximating that which the general public enjoys as is possible), but it does allow some flexibility in the means for carrying out the statutory mandates.
Arranged service is not without limits, however. As is true in all cases, the aim is to enable the disabled access to the same services and places as are available to the nondisabled. No more is required, regardless of available funds. Second, as noted above, WAC 162-26-060(4) says that the goal is for disabled persons to "have the enjoyment of places of public accommodation to the greatest extent practical." At some point, the impracticality of providing service or access will simply be too great. Third, along the same lines, WAC 162-26-070 provides that the Human Rights Commission "will grant exceptions to the rules of this chapter under the standards set out in WAC 162-06-030." WAC 162-06-030(9)(a) provides that an exception may be granted if "[c]ompliance with the rule would cause unreasonable hardship...." Thus, contrary to the majority's implication, majority at 13 n. 16, there is relief available if compliance with WAC 162-26 would impose too heavy a burden, including a financial burden.
As can be seen from these true limitations on services, the trial court's application of a "reasonably possible" standard is completely consistent with what is required. When the only option is to provide arranged service, it is appropriate to consider the reasonableness and practicality of the service. Nor is the "reasonably possible" standard untenableit is, as explained, precisely the standard to be applied where reasonable accommodation is the method of service.
In short, the majority has taken the trial court's application of the "reasonably possible" standard out of context, given the term a meaning it does not have under the applicable WACs and case law, and combined the resulting wrong standard with the trial court's observation that there is no dispute in this case that funding for paratransit services is available. The majority thus creates a "strawman" to knock down, i.e., the specter of unlimited services at unlimited cost.
Just as I must take issue with the majority's assessment of the trial court's ruling in light of the statutes and the applicable WACs, I take issue with the majority's articulation of the prima facie case. Under RCW 49.60.030 and .215, a place of public accommodation need not intend to deny service or access for a violation to occur.[2] Neutral conduct, or inaction, may be violative of the statutes and WACs as surely as intentional or negligent conduct. Thus, it makes little sense to require a plaintiff, as part of the prima facie case, to prove that the disability caused the discrimination, as the majority requires. Majority at 1327. What RCW 49.60.215 in fact states is that if the defendant's acts have "result[ed] in any distinction, restriction, or discrimination" an unfair practice has occurred. Thus, the causal question the statute poses relative to plaintiffs' prima facie case is whether defendant's *1335 actions have caused a denial of full enjoyment of places of public accommodation to the disabled plaintiff. Because defendant's intent is irrelevant, that question is answered in the first three factors identified by the majority.
Thus, the prima facie case should consist of a showing of the first three factors identified by the majority: (1) that plaintiff is disabled within the meaning of the statutes; (2) that defendant's business or establishment is a place of public accommodation; and (3) that plaintiff was denied full enjoyment of the place of public accommodation. Once the plaintiff has made his or her prima facie case, then the burden shifts to the defendant, who must produce evidence of a legitimate reason denying full enjoyment of places of public accommodation. As explained, compliance with the ADA is not a legitimate reason for noncompliance with State law, which must be given independent effect. However, as also explained, some legitimate reasons have been identified by the Human Rights Commission: that providing service or access is not practical, or that it constitutes an unreasonable hardship.
If the defendant produces evidence of a legitimate reason for denying the right of full enjoyment, plaintiff can rebut the evidence produced in support of such defense and thereby create a material issue of fact. However, plaintiff does not have a burden to show that the defendant's proffered reason is pretextual. Intent, or motive, to discriminate on the basis of disability simply has no place in the equation, and production of evidence showing the proffered reason is a pretext masking an unlawful intent is not required.
Here, insofar as plaintiffs' prima facie case is concerned, the only real question is whether the Spokane Transit Authority's (STA) service area is a place of public accommodation, or, as the majority says, whether only its fixed lines, structures, and the like, constitute a place of public accommodation. RCW 49.60.040(10) provides in part that "`[a]ny place of public resort, accommodation, assemblage, or amusement' includes, but is not limited to, any place ... for public conveyance or transportation on land ... including the stations and terminals thereof and the garaging of vehicles...." (Emphasis added). Contrary to the majority, I do not find in this definition the limitations it states are therein. Twice this definition signals that it should be read expansivelyfirst when it begins by saying that places of public accommodation include, but are "not limited to", the listed things, and second when it refers to places for public conveyancing as "including" certain places. Clearly the Legislature did not intend that only the listed items constitute places of public accommodation. See generally, I.J. Schiffres, Annotation, What Businesses or Establishments Fall Within State Civil Rights Statute Provisions Prohibiting Discrimination, 87 A.L.R.2d 120, 136 § 3[c] (1963). Further, the Legislature has directed that RCW 49.60 is to be liberally construed to the end that its purposes are accomplished. RCW 49.60.020. The purpose of the chapter is to eliminate discrimination, which "threatens ... the rights and proper privileges of [this state's] inhabitants...." RCW 49.60.010.
Given the nonexclusiveness of the list of places of public accommodation in RCW 49.60.040(10), and the command to construe RCW 49.60 liberally to achieve its purpose, this court should not restrictively read the language regarding transportation. The definition is clearly broad enough to encompass STA's benefit area.
In addition, if the statute is read to encompass only fixed routes and physical structures there is no room for arranged service as a method of providing service because either same service or reasonable accommodation would suffice. Such a result is not only inconsistent with the WACs prescribing arranged service, it is also inconsistent with the majority's own view that the paratransit service provided under the ADA satisfies Washington law.
In any event, even if the fixed lines and physical structures are the place of public accommodation, what is at issue is the right of the disabled to use public transportation just as the nondisabled do. Even though fixed routes do not he near every nondisabled person in the benefit area, a nondisabled person can make his or her way to a fixed route and take advantage of the public transportation system. If, because of disability, a person cannot reach the fixed routes or the *1336 paratransit corridor, transportation services are denied that person. That person cannot have full enjoyment, or any enjoyment, of what is available to the nondisabled unless arranged service such as STA's paratransit service is provided. If the statutes are read as the majority reads them, the civil right embodied in RCW 49.60.030 echoes hollowly for plaintiffs. Full enjoyment of places of public accommodation means nothing if no use is possible.
Finally, I must take issue with the majority's insupportable conclusion that "services" do not fall within the State laws prohibiting discrimination in places of public accommodation. RCW 49.60.040(10) expressly refers to services. RCW 49.60.040(9), which defines "full enjoyment", says that "`[f]ull enjoyment of includes the right to purchase any service[s]... offered or sold ... by, any establishment to the public...." (Emphasis added.) Moreover, what the STA provides is transportation services, and even the majority seems to agree that some level of those services must be provided.
I would hold the STA's benefit area defines the place of public accommodation as a matter of law. STA is not thereby obliged to provide unreasonable paratransit servicesimpracticality and unreasonable hardship still serve as limitations.
I would hold that the plaintiff class has made its prima facie case. STA offered no legitimate reason for its failure to provide arranged service for the individual plaintiffs. As a matter of law its compliance with the ADA does not excuse noncompliance with State law. STA does not dispute any facts material under the analysis in this opinion. It has conceded it has the physical and financial ability to provide paratransit services to plaintiffs and plaintiff class. Accordingly, plaintiffs are entitled to judgment as a matter of law, as the trial court ruled.
Before turning to the third problem with the majority opinion, two additional "horribles" raised by the majority must be dispelled. On page 1324, the majority says that STA was obliged to choose between complying with state and federal laws at peril of lawsuits. Nonsense. Nothing indicates that STA cannot comply with both.[3] Indeed, the ADA states in part:
Nothing in this [Act] shall be construed to invalidate or limit the remedies, rights, and procedures of any ... law of any State or political subdivision of any State or jurisdiction that provides greater ... protection for the rights of individuals with disabilities than are afforded by this [Act].
42 U.S.C.A. § 12201(b).
On pages 1329, the majority says that interpreting place of public accommodation to include more than fixed lines and physical structures has profound and unsettling implications for fixed point services like libraries and schools. Again, nonsense. The service provided by a public transportation entity like the STA necessarily involves moving people from point to point, and if that entity has a benefit area, as does the STA, then affording full enjoyment of the place of public accommodation involves moving people within that benefit area. A library is a fixed point and the service it provides does not involve the movement of people from place to place. The disabled are entitled to use the services of the library, of course, but nothing in the statutes, the WACs, or the analysis in this opinion would require that a library reach throughout a county and transport people to the library to use the services.
Finally, the third problem with the majority opinion is that it represents a giant step backward for our society. Instead of giving effect to statutes and regulations clearly designed to allow disabled people the same, or as nearly as possible the same, quality of life as the nondisabled, the majority seems intent on narrowing the protections afforded as much as possible. I am saddened by the majority's apparent dissatisfaction with Plaintiffs' suitthe majority says, at 27, that it is not clear why the Plaintiffs think Washington's Law Against Discrimination provides a basis for a discrimination lawsuit in a plan which apparently complies with the ADA. The answer is simple, and profound. It is because State law provides, in this instance, *1337 greater protection than does the federal law, and plaintiffs who heretofore could travel using public transportationto school, community centers, doctors, friendscannot unless this court rejects the argument that compliance with the ADA is all that is required.
This case is about real people who are disabled. For example, Evelyn Fell is an eighty-year-old woman who is severely disabled because of artificial joints. She can barely walk from room to room in her house (approximately 20 feet) and must use a wheelchair to be mobile. Previously, she used paratransit services for shopping, doctor visits, and social activities. To get within the new paratransit service corridor, she would have to wheel herself along a road on its unpaved rocky shoulder. Her wheelchair is not built for such conditions, nor is her wheelchair designed for use in snow and ice in the winter. She is frightened to attempt the journey because the roads are poorly lit and the cars travel quite quickly.
Paul Clements is a twenty-five-year-old man who is confined to a wheelchair and must use a computer to talk. He used the former paratransit services to attend Eastern Washington State University where he is pursuing a bachelor of arts degree in psychology and has a 3.4 grade point average. He is unable to get to the new paratransit corridor by himself and often cannot get the help he needs to get there. Even when he can get a ride to the corridor, such transport is extremely difficult because the computer with which he talks must be disassembled and reassembled each time he gets in and out of a vehicle. Jean Toews is a forty-six-year-old woman with multiple sclerosis who is confined to a wheelchair. She had previously used paratransit services for essential medical and doctor appointments. In order to receive paratransit services under the new plan, she would have to wheel herself a mile to the corridor.
These Plaintiffs, and others in plaintiff class who live outside the designated corridors in the new paratransit plan, have found it extremely difficult, if not impossible and dangerous, to get within the corridors so they can receive service. Our laws require that they have the same right to full enjoyment of STA's public transportation services as the general public.
I would affirm the trial court's grant of summary judgment in favor of Plaintiffs. Plaintiffs are entitled to an award of attorney fees and costs for proceedings before the trial court and on this appeal under RCW 49.60.030(2).
NOTES
[1] STA sent individual notices to individuals affected by the new paratransit plan; thirty-three people responded indicating they would be affected and ninety-nine individuals did not respond. (Clerk's Papers at 65, 191.)
[2] The trial court's memorandum opinion notes that the STA plan was proposed to meet ADA and DOT regulatory requirements. (Clerk's Papers at 281-82.) The trial court specifically found: "Defendant's adoption of the three-quarter mile limitation is within its authority and is pursuant to federal guidelines." (Emphasis ours.) (Clerk's Papers at 283.) The trial court findings on the permanent injunction also reflect that STA's plan was designed to meet ADA and the DOT regulations. (Clerk's Papers at 286.)

Plaintiffs did not assign error to the trial court's determination that STA's paratransit plan was adopted in accordance with federal guidelines and did not argue that STA failed to comply with ADA and DOT regulations. Plaintiffs, in fact, argued that a party in compliance with ADA and its regulations could nevertheless violate RCW 49.60. (Br. of Resp't at 34-41.)
[3] Forty percent of STA's bus fleet was accessible to the disabled at the time this action was filed. STA plans to increase that percentage to ninety percent by 1999.
[4] The suit was filed on October 1, 1993, simultaneously with a motion for temporary injunctive relief followed by STA's motion for summary judgment on October 26, 1993. No discovery was conducted in the case, a fact plaintiffs noted below in resisting STA's motion for summary judgment.
[5] The annual cost of providing paratransit service to the 132 members of the plaintiff class allegedly was $12,320. This figure is counterintuitive. It is difficult to believe that a van and driver can be provided to up to 132 paratransit users for a year at such a cost. The record indicates the per trip cost of paratransit service exceeds $10. (Clerk's Papers at 195.) The 1991 average number of trips per year was 31.5. (Clerk's Papers at 229.) Either the plaintiffs' use of the service was minimal or the cost was understated.
[6] This "reasonably possible" standard may have a basis in pre-ADA federal law where the United States Supreme Court attempted in Southeastern Community College v. Davis, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), and Alexander v. Choate, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), to articulate a limiting principle to section 504 of the Rehabilitation Act of 1973. The Court noted that federally funded programs must reasonably accommodate disabled people provided that such accommodation does not require substantial alteration of the programs and undue financial burdens.
[7] 1. Is there a legitimate, non-discriminatory basis for refusing paratransit service to plaintiffs?

2. What is the "place" of STA's place of accommodation?
3. Does the denial of paratransit service to plaintiffs "most completely approximate service to the general public"?
4. Did STA change the boundaries of the public benefit transportation area and, if so, did it comply with the procedural and substantive requirements of RCW 36.57A.030?
5. Given STA's financial capabilities, is STA providing an accommodation to plaintiffs to "the greatest extent practical"?
6. Does providing paratransit service to plaintiffs impose an unreasonable burden on STA?
(Clerk's Papers at 149.) The stipulation of the parties does not resolve most of these questions of material fact.
[8] Neither RCW 49.60 nor WAC Title 162 defines "discrimination," but WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1949) defines "discrimination" as

A distinction, as in treatment; esp., an unfair or injurious distinction. Specif., arbitrary imposition of unequal tariffs for substantially the same service; a difference in treatment made between persons, localities, or classes of traffic, in respect to substantially the same service.
[9] RCW 49.60.040(10) defines a "place of public resort, accommodation, assemblage, or amusement" as any place "where charges are made for admission, service, occupancy, or use of any property or facilities ... for public conveyance or transportation...." See also RCW 9.91.010 (criminal statute punishing discrimination, including discrimination in public accommodations). "Full enjoyment" is defined in RCW 49.60.040(9). The definition does not set forth a specific level of services.
[10] WAC 162-26 was adopted in 1982, eight years before the ADA, and has not been amended since. The dissent properly notes that this is an "arranged service" case (WAC 162-26-060(3) and 162-26-090), and not a "reasonable accommodation" case (WAC 162-26-060(2) and 162-26-080). (Dissent at 2-3.) Yet the dissent finds no defect with the trial court's transplantation of the "reasonably possible" language from the "reasonable accommodation" standard (WAC 162-26-080(2)) into the "arranged service" standard (WAC 162-26-090). The dissent, in conclusory fashion, simply asserts "while the WACs regarding arranged service do not refer to `reasonably possible,' it is obvious that they encompass such a reasonableness standard." (Emphasis added.) (Dissent at 3.) The dissent thereby finesses the central problem in this case: articulating a sound test for discrimination against the disabled in places of public accommodation that does not convert Washington's Law Against Discrimination into an entitlement statute.
[11] "Same service" is often referred to as "mainstreaming." It is not clear that this regulation can be read consistently with RCW 49.60.215, which states in pertinent part: "[T]his section shall not be construed to require structural changes, modifications, or additions to make any place accessible to a disabled person except as otherwise required by law." (Emphasis ours.)
[12] Where the ADA specified conduct or levels of service, a violation of such standards would be a violation of the ADA even without a finding of discrimination: "Thus, the ADA and its attendant regulations clearly define unnecessary segregation as a form of illegal discrimination against the disabled. Accordingly, the district court erred in holding that the applicable provisions of the ADA `may not be invoked unless there is first a finding of discrimination.'" Helen L., 46 F.3d at 333 (footnote omitted).
[13] The Senate Committee on Labor and Human Resources defined "comparable level of services" as follows:

The term "comparable level of services" means that when all aspects of a transportation system are analyzed, equal opportunities to use the transportation system exist for all personsindividuals with and without disabilities. The essential test to meet is whether the system is providing a level of service that meets the needs of persons with and without disabilities to a comparable extent.
S.REP. NO. 101-116, 101st Cong., 1st Sess. 52 (1989).
[14] The DOT rejected an approach that would have permitted the transit agency to define the service area. 56 Fed.Reg. 45,606 (1991).
[15] Under RCW 49.60.215 and WAC 162-26-070, notwithstanding the cost to the transit agency, fares for paratransit service may not exceed fares for the regular service of the transit agency.
[16] No comparable discussion of fiscal constraint is present in state statute or regulation under RCW 49.60. It is notable in this regard that WAC 162-22-080, concerning accommodations for handicapped employees, contains a provision that permits an employer to avoid having to accommodate a handicapped employee if to do so would impose "an undue hardship on the conduct of the employer's business."
[17] The current financial status of an organization provides only a precarious and shifting ground upon which to base determinations of unlawful discrimination. If, for instance, in 1993 the STA had run a budget deficit, would the same paratransit services plan be "non-discriminatory"? If the agency had unused taxing authority or could raise fares, would such factors be determinative? If the STA determined to eliminate a route that had limited use, but happened to serve disabled people or elderly individuals, in favor of additional routes in a growing part of Spokane, would such operational decisions by the transit agency be discriminatory? (This concern is not theoretical as STA decided to eliminate paratransit service on demand for all elderly persons in favor of a standard based on the ability of the individual to access the fixed route system.) A court should not delve so intrusively into local transit agency operations, making questions of discrimination rise or fall on the agency's varied fiscal fortunes.

If the restraint is operational, the trial court's analysis is equally flawed. Public transit agencies make service decisions with great frequency. The Seattle Post-Intelligencer in its February 25, 1995, issue at page B2 reported:
About every four months, Metro Transit fiddles with a few of its 270 bus routes that criss cross more than 2,100 square miles of King County.
Plainly, transit agencies need to make operational decisions. In so doing, under the "reasonably possible" test, the agencies have no standard to gauge whether their action is discriminatory.
[18] The dissent dismisses the majority's concern with the effect of the dissent's approach on other providers of public services, like libraries, concluding that nothing in state law would require a library to transport the disabled to the library to use its services. This conclusory statement is not at all obvious in view of the dissent's approach to this case. A disabled person who cannot reach a public library has obviously been denied the "full enjoyment" of the services the library offers. "Full enjoyment of places of public accommodation means nothing if no use is possible." (Dissent at 1336.) But suppose, under the dissent's analysis, it is "reasonably possible" for a library to provide a paratransit van for the disabled simply by raising user fees and/or cutting its book purchasing budget. There is nothing in the dissent's approach that would prevent a disabled person from stating a claim under RCW 49.60.215 against a library for failure to transport that person to the library so that he or she may have "full enjoyment" of its services. Under the majority's approach, on the other hand, the test for discrimination looks to comparability of treatment between the nondisabled and disabled.

In a recent case involving claims that an employer failed reasonably to accommodate a disabled employee, Judge Posner wrote:
It would not follow that the costs and benefits of altering a workplace to enable a disabled person to work would always have to be quantified, or even that an accommodation would have to be deemed unreasonable if the cost exceeded the benefit however slightly. But, at the very least, the cost could not be disproportionate to the benefit. Even if an employer is so large or wealthyor, like the principal defendant in this case, is a state, which can raise taxes in order to finance any accommodations that it must make to disabled employeesthat it may not be able to plead "undue hardship," it would not be required to expend enormous sums in order to bring about a trivial improvement in the life of a disabled employee. If the nation's employers have potentially unlimited financial obligations to 43 million disabled persons, the Americans with Disabilities Act will have imposed an indirect tax potentially greater than the national debt.
Vande Zande v. State of Wis. Dep't of Admin., 44 F.3d 538, 542-43 (7th Cir.1995) (emphasis added).
[19] "Generally ... federal courts have applied the settled principles of employment discrimination law to the ADA." West v. Russell Corp., 868 F.Supp. 313, 316 (M.D.Ala.1994). See also Flasza v. TNT Holland Motor Exp., Inc., 159 F.R.D. 672 (N.D.Ill.1994) (employment discrimination against the disabled); United States v. Morvant, 898 F.Supp. 1157 (E.D.La.1995) (AIDS discrimination in place of public accommodation); Harmer v. Virginia Elec. & Power Co., 831 F.Supp. 1300 (E.D.Va.1993) (retaliation claim in case of failure to accommodate disability in place of employment); Petersen ex rel. Petersen v. Hastings Public Schools, 831 F.Supp. 742 (D.Neb. 1993), aff'd, 31 F.3d 705 (8th Cir.1994) (claim for interpreters for hearing-impaired children during school hours).
[20] In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), the Supreme Court adopted the following four-part test for making out a prima facie case of employment discrimination: the plaintiff must show (a) qualification for the job the employer was seeking to fill; (b) rejection despite qualifications; (c) that the position remained open; and (d) that the employer continued to seek applicants with plaintiff's qualifications. See also Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).
[21] See generally PHILIP K. HOWARD, THE DEATH OF COMMON SENSE: HOW LAW IS SUFFOCATING AMERICA 113-68 (1994).
[22] Because examination of comparability of treatment is the analytical touchstone of a case of alleged discrimination on account of disability, it is surprising the dissent says that a prima facie case of discrimination against the disabled "should consist of a showing of the first three factors identified by the majority," and then gives the third factor as "plaintiff was denied full enjoyment of the place of public accommodation." (Dissent at 1334.) That is not the third factor of the majority's prima facie case.
[23] Our courts have employed a curious, circular definition of handicap/disability. Discrimination is present if a person is disabled and the person is discriminated against because of that disability. This formulation is hardly crystal-like in its clarity. See, e.g., Jane Doe v. Boeing Co., 121 Wash.2d 8, 14-16, 846 P.2d 531 (1993) (transsexualism is not a handicap); Goodman v. Boeing Co., 75 Wash.App. 60, 877 P.2d 703 (1994), review granted, 125 Wash.2d 1020, 890 P.2d 463 (1995); Michelsen v. Boeing Co., 63 Wash.App. 917, 826 P.2d 214 (1991); Simmerman v. U-Haul Co., 57 Wash.App. 682, 789 P.2d 763 (1990).
[24] Washington law on what constitutes a public accommodation is extensive. Restaurants (Powell v. Utz, 87 F.Supp. 811 (E.D.Wash.1949)), parks and public resorts (Davis v. Tacoma Ry. & Power Co., 35 Wash. 203, 77 P. 209 (1904)), movie theaters (Anderson v. Pantages Theatre Co., 114 Wash. 24, 194 P. 813 (1921)) (Randall v. Cowlitz Amusements, Inc., 194 Wash. 82, 76 P.2d 1017 (1938)), a weight control clinic (Browning v. Slenderella Sys., 54 Wash.2d 440, 341 P.2d 859 (1959)), and barbershops (In re Johnson, 71 Wash.2d 245, 427 P.2d 968 (1967)) have been held to be places of public accommodation. In Goff v. Savage, 122 Wash. 194, 210 P. 374 (1922), this court held that a soda fountain was not a place of public accommodation.
[25] A carrier like Greyhound, after fully complying with the ADA, might be surprised to discover that not only are its buses and terminals places of public accommodation in Washington, but that its entire service area is a place of public accommodation and, under the plaintiffs' approach, it would be obligated to provide an arranged service to all qualified individuals in that service area under RCW 49.60.
[26] If a disabled person lives in the Cascade foothills and demands library services, does King County discriminate by not bringing the service to that individual? The place of public accommodation in this hypothetical, under the plaintiffs' analysis, is not the library itself or its branches, but the entire service area of the jurisdiction providing the service, i.e., all of King County.
[27] The Dissent at page 1336 says the majority concluded that "`services' do not fall within the State laws prohibiting discrimination in places of public accommodation." The majority does not say or even imply as much. The majority opinion simply states that a place of public accommodation is just that, a place, not a service.
[28] In other circumstances, the Washington Legislature has chosen to enact a state statutory counterpart to a federal enactment. See, e.g., 18 U.S.C. §§ 1961-1968 (RICO)/RCW 9A.82 (PICO); 40 U.S.C. §§ 276a-276c/RCW 39.12 (Davis-Bacon Act/"Little Davis-Bacon" on wages in public contracts). The Legislature did not adopt a counterpart to ADA conferring similar entitlements upon disabled people in Washington.
[29] See also Coville v. Cobarc Servs., Inc., 73 Wash.App. 433, 869 P.2d 1103 (1994) (female employee inadvertently encountered male supervisor in locked room masturbating; court held no cause of action under RCW 49.60 because the conduct comprising the alleged sexual harassment and/or retaliation claim was not the result of plaintiff's gender); Michelsen v. Boeing Co., 63 Wash.App. 917, 826 P.2d 214 (1991) (no evidence of handicap when worker was released to work); Chadwick v. Northwest Airlines, Inc., 100 Wash.2d 221, 667 P.2d 1104 (1983) (chronic absenteeism and unsatisfactory work, rather than handicap, resulted in discharge).
[30] The dissent is mistaken in concluding that the majority's approach requires proof of intent to discriminate. The majority's test for discrimination requires only that the alleged discrimination result from something the defendant has done, and not from some other cause. This is a reflection of the necessity for establishing proximate cause, and has nothing to do with the subjective intent of the defendant. Regardless of the subjective intent of the defendant, if discrimination has resulted from some act of the defendant, the plaintiff can state a claim against that defendant. We recently adopted the "substantial factor" test in Mackay v. Acorn Custom Cabinetry, Inc., 127 Wash.2d 302, 898 P.2d 284 (1995), as the proper causation element in a gender discrimination case.
[31] Here, STA was caught in a classic Catch-22 (JOSEPH HELLER, CATCH-22 58 (1966): In complying with ADA and DOT regulations, STA subjected itself to a cause of action for discrimination under RCW 49.60.
[32] In the McDonnell Douglas protocol, a plaintiff establishes pretext by showing that the employer's reasons for the allegedly discriminatory action are unworthy of credence or that the decision to terminate was more likely than not motivated by discriminatory reasons. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).
[33] The question of whether the plaintiffs might wish to proceed on the basis of a disparate treatment or disparate impact theory remains open as well. Oliver v. Pacific Northwest Bell Tel. Co., 106 Wash.2d 675, 724 P.2d 1003 (1986) (race discrimination); E-Z Loader Boat Trailers, Inc. v. Travelers Indem. Co., 106 Wash.2d 901, 726 P.2d 439 (1986) (sex discrimination). To prove disparate treatment, the plaintiffs must prove that STA intended to discriminate. Id. at 910, 726 P.2d 439.
[34] Dick Thornburgh, The Americans With Disabilities Act: What it Means to All Americans, 64 TEMP.L.REV. 375, 375 (1991).
[35] Pete V. Domenici, Preface: Special Law Review Issue on the Americans With Disabilities Act, 22 N.M.L.REV. 1, 4 (1992) (comparing the struggles of the disabled for equality with the struggles of African-Americans).
[36] Chicago Tribune, Sept. 8, 1989, § 1, at 1.
[37] BONNIE P. TUCKER & BRUCE A. GOLDSTEIN, LEGAL RIGHTS OF PERSONS WITH DISABILITIES 21:1 (1992).
[1] There is no challenge to the Human Rights Commission's delegated authority to promulgate the regulations at issue in this case. RCW 49.60.110 authorizes the Commission to formulate policies, and RCW 49.60.120(3) authorizes the Commission to promulgate rules and regulations to carry out the provisions of RCW 49.60 and the policies and practices of the Commission. "Where the Legislature has specifically delegated the power to make regulations to an administrator, such regulations are presumed to be valid." St. Francis Extended Health Care v. Department of Social & Health Services, 115 Wash.2d 690, 702, 801 P.2d 212 (1990).
[2] To the extent the majority seems to suggest that statutory analysis parallels constitutional equal protection analysis, a word of caution is in order. A statute may provide greater protections than the equal protection clauses of the state and federal constitutions. For this reason, compliance with the statutes is not wholly dependent upon equal protection analysis.
[3] The majority trivializes this case with its reference to Joseph Heller's Catch 22. Majority at 1331 n. 31.