# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| CHRISTOPHER H. FLOETING,<br><br>    Appellant,<br><br>  v.<br><br>GROUP HEALTH COOPERATIVE, a<br>Washington corporation,<br><br>    Respondent. | DIVISION ONE<br><br>No. 75057-7-I<br><br>PUBLISHED OPINION<br><br>FILED: October 9, 2017 |

DWYER, J. — Washington's antidiscrimination law forbids sex discrimination in places of public accommodation. Sexual harassment is a form of sex discrimination. Accordingly, the law prohibits sexual harassment in places of public accommodation.

Christopher Floeting alleges that he was a victim of sexual harassment perpetrated by an employee of Group Health Cooperative. His factual submissions to the trial court were sufficient to overcome Group Health's request for summary judgment dismissal of his lawsuit. Because the trial court ruled otherwise, we reverse.

I

Floeting is a patient of Group Health, a nonprofit health care system. For over 30 years, Floeting visited Group Health's Northgate Medical Center to receive medical services and obtain prescription medicine.

In early September 2012, Floeting told a Group Health employee that he wished to file a complaint regarding T.T., another Group Health employee. Floeting said that, while visiting the medical center over the past few months, T.T. had engaged in several inappropriate conversations with him, including telling him that, over the past weekend, she had locked her boyfriend in a bedroom, danced in front of him, and watched pornographic videos with him. Floeting told the Group Health employee (with whom he filed his complaint) that T.T.'s conduct was sexual harassment, that it made him feel very uncomfortable, and that he wanted T.T.'s conduct toward him to stop.

A few weeks later, after conducting an investigation related to both Floeting's complaint and another patient's complaint, T.T.'s employment with Group Health was terminated.

In July 2015, Floeting sued Group Health, alleging that the Washington Law Against Discrimination (WLAD)[1] provides for a right against sexual harassment by an employee of a place of public accommodation and that Group Health, because of T.T.'s conduct, had deprived him of this right. Group Health moved for summary judgment, arguing that the WLAD does not recognize such a right and, alternatively, that Floeting failed to present sufficient facts to support a sexual harassment claim.

According to Floeting, as stated either in his deposition or his declaration in opposition to Group Health's summary judgment motion, T.T. had engaged in inappropriate conduct in addition to that documented in Group Health's record of

---

[1] Ch. 49.60 RCW.

his complaint. Floeting testified that, when he visited Group Health that summer, T.T. had repeatedly approached him in the waiting room, while he was standing in line waiting to receive medical services, or while he was walking down a hallway.

Floeting also said that, when T.T. approached him, she had asked him, "[d]o you like sex," told him that she gives "the best blowjobs," stated that she liked how "hot" he made her, said that he had a "nice ass," and offered that "I bet you have a big cock. I'd like to see it." Floeting detailed that on a few occasions when he was sitting in the waiting room, T.T. sat next to him, "leaned in," and "pressed her breasts" against him while telling him "how much she liked" him. Floeting said that he repeatedly told T.T. to stop engaging with him in this way.

According to Group Health's administrative records, Floeting visited the medical center on 11 occasions during the summer of 2012. On at least 7 of those 11 days, T.T. had been scheduled to work at the medical center at the same time.

In response to the parties' briefing and evidentiary submissions, the trial court granted Group Health's motion for summary judgment and dismissed Floeting's lawsuit.

Floeting now appeals.

II

The various questions presented for our review arise from a summary judgment order.

> We engage in a de novo review of a ruling granting summary judgment. <u>Anderson v. Weslo, Inc.</u>, 79 Wn. App. 829, 833, 906

P.2d 336 (1995). Thus, we engage in the same inquiry as the trial court. <u>Wilson Court Ltd. P'ship v. Tony Maroni's</u>, Inc., 134 Wn.2d 692, 698, 952 P.2d 590 (1998). Summary judgment is properly granted when the pleadings, affidavits, depositions, and admissions on file demonstrate that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law. CR 56(c); <u>Hutchins v. 1001 Fourth Ave. Assocs.</u>, 116 Wn.2d 217, 220, 802 P.2d 1360 (1991).

<u>Green v. Normandy Park Riviera Section Cmty. Club, Inc.</u>, 137 Wn. App. 665, 681, 151 P.3d 1038 (2007). "In reviewing a summary judgment order, we view the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party." <u>Holmquist v. King County</u>, 182 Wn. App. 200, 207, 328 P.3d 1000 (2014) (citing <u>Dumont v. City of Seattle</u>, 148 Wn. App. 850, 861, 200 P.3d 764 (2009)).

In the course of analyzing several of the questions presented, we must construe certain portions of the relevant code chapter. In interpreting the WLAD, we resort to familiar principles of statutory construction, including reviewing the statutory language for its plain meaning. <u>State v. Arlene's Flowers, Inc.</u>, 187 Wn.2d 804, 825-26, 389 P.3d 543 (2017). In so doing, we must deem no part of a statute "inoperative or superfluous unless it is the result of obvious mistake or error." <u>Klein v. Pyrodyne Corp.</u>, 117 Wn.2d 1, 13, 810 P.2d 917, 817 P.2d 1359 (1991) (citing <u>Cox v. Helenius</u>, 103 Wn.2d 383, 387-88, 693 P.2d 683 (1985); <u>Newschwander v. Bd. of Trs. of Wash. State Teachers Ret. Sys.</u>, 94 Wn.2d 701, 707, 620 P.2d 88 (1980)). "This requires that every word, clause, and sentence of a statute be given effect, if possible." <u>Klein</u>, 117 Wn.2d at 13. We must assign familiar legal terms in a statute their familiar legal meaning. <u>Rasor v. Retail Credit Co.</u>, 87 Wn.2d 516, 530, 554 P.2d 1041 (1976).

In addition, the legislature has directed that the provisions of the WLAD "shall be construed liberally for the accomplishment of the purposes thereof." RCW 49.60.020.

### III

Floeting's cause of action against Group Health is premised on his claim of sexual harassment. But Floeting can have no such cause of action unless the WLAD protects patrons of places of public accommodation against sexual harassment. Group Health asserts that the WLAD affords no such protection. We disagree.

Several provisions of the act are particularly pertinent to this inquiry. RCW 49.60.030(1) establishes that "[t]he right to be free from discrimination because of . . . sex . . . is recognized as and declared to be a civil right." "'Sex' means gender." RCW 49.60.040(25). Moreover, the act provides that

> [i]t shall be an unfair practice for any person or the person's agent or employee to commit an act which directly or indirectly results in any distinction, restriction, or discrimination, or the requiring of any person to pay a larger sum than the uniform rates charged other persons, or the refusing or withholding from any person the admission, patronage, custom, presence, frequenting, dwelling, staying, or lodging in any place of public . . . accommodation . . . , except for conditions and limitations established by law and applicable to all persons, regardless of . . . sex.

RCW 49.60.215(1).

The WLAD plainly affords protection against sex discrimination.

Sexual harassment is a form of sex discrimination. Our Supreme Court recognized this more than three decades ago. In discussing the WLAD's guarantee against discrimination in employment, RCW 49.60.180, the court

- 5 -

observed that "[s]exual harassment as a working condition unfairly handicaps an employee against whom it is directed in his or her work performance and as such is a barrier to sexual equality in the workplace." Glasgow v. Georgia-Pac. Corp., 103 Wn.2d 401, 405, 693 P.2d 708 (1985).

The United States Supreme Court has recognized the same as being true in the context of Title VII[2] actions. "Without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986) (alteration in original).

This court has expressed a similar view. We have ruled sexual harassment to be a form of sex discrimination when it occurs in the course of real estate transactions, Tafoya v. Human Rights Comm'n, 177 Wn. App. 216, 223-25, 311 P.3d 70 (2013) (construing provisions of the WLAD), or in educational institutions, S.S. v. Alexander, 143 Wn. App. 75, 93-98, 177 P.3d 724 (2008) (construing Education Amendments of 1972, Title IX, 20 U.S.C. § 1681-1688).

Sexual harassment subjects a person to a "distinction, restriction, or discrimination" because of that person's sex, in contravention of RCW 49.60.215(1). It causes a person "to be treated as not welcome, accepted, desired, or solicited" on the same basis as others, as proscribed by RCW 49.60.040(14). And, on the basis of the person's sex, it deprives that person of the right to "the full enjoyment of any of the accommodations, advantages,

---

[2] Civil Rights Act of 1964, Title VII, 42 U.S.C. §§ 2000e to 2000e-17.

facilities, or privileges" of places of public accommodation, as addressed in RCW 49.60.030(1)(b).

The WLAD prohibits sex discrimination in places of public accommodation. Sexual harassment is a form of sex discrimination. The WLAD affords protection against sexual harassment in places of public accommodation.

## IV

## A

"RCW 49.60.030(2)[3] authorizes private plaintiffs to bring suit for violations of the WLAD." Arlene's Flowers, 187 Wn.2d at 821.

> To make out a prima facie case under the WLAD for discrimination in the public accommodations context, the plaintiff must establish four elements: (1) that the plaintiff is a member of a protected class, RCW 49.60.030(1); (2) that the defendant is a place of public accommodation, RCW 49.60.215; (3) that the defendant discriminated against the plaintiff, whether directly or indirectly, id.; and (4) that the discrimination occurred "because of" the plaintiff's status or, in other words, that the protected status was a substantial factor causing the discrimination, RCW 49.60.030.

Arlene's Flowers, 187 Wn.2d at 821-22; see also Fell v. Spokane Transit Auth., 128 Wn.2d 618, 637, 911 P.2d 1319 (1996) (announcing similar construct for disability discrimination claims under RCW 49.60.215).

In evaluating a claim premised on sexual harassment, as Floeting propounds, the first, second, and fourth elements will usually be fairly easy to analyze. Because of the nature of sexual harassment, the third element may often call for a nuanced or more complex analysis.

---

[3] "Any person deeming himself or herself injured by any act in violation of this chapter shall have a civil action in a court of competent jurisdiction to enjoin further violations, or to recover the actual damages sustained by the person, or both, together with the cost of suit including reasonable attorneys' fees . . . ."

Sexual harassment may often occur in circumstances quite different from those attendant to other forms of discrimination. One need only turn to Arlene's Flowers and Fell to see this in play. In both of those cases, the alleged discriminatory actions were the official acts of those in control of the public accommodation. See Arlene's Flowers, 187 Wn.2d 804 (discriminatory act was the decision to refuse service—made by owner); Fell, 128 Wn.2d 618 (discriminatory act was the decision to eliminate service—made by board of directors). But few corporate boards will formally mandate the sexual harassment of patrons, nor will they formally authorize the tolerance of such behavior. Nevertheless, patrons must receive the protection envisioned by the WLAD.

Thus, in discerning and discussing that which must be shown to satisfy the Arlene's Flowers four-element test in cases premised on sexual harassment, we must keep relevant statutory admonitions in mind. First, the right to be free from discrimination based on sex, and—hence—sexual harassment, has been declared by our legislature to be a civil right.[4] RCW 49.60.030(1). Second, the WLAD "shall be construed liberally for the accomplishment of the purposes thereof." RCW 49.60.020. Such a "statutory mandate of liberal construction requires that we view with caution any construction that would narrow the coverage of the law." Marquis v. City of Spokane, 130 Wn.2d 97, 108, 922 P.2d

---

[4] *The right to be free from discrimination* because of race, creed, color, national origin, *sex*, honorably discharged veteran or military status, sexual orientation, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability *is recognized as and declared to be a civil right.*
RCW 49.60.030(1) (emphasis added).

43 (1996) (citing Shoreline Cmty. Coll. Dist. No. 7 v. Dep't of Emp't Sec., 120 Wn.2d 394, 406, 842 P.2d 938 (1992)). Finally, our legislature declared "that practices of discrimination against any of its inhabitants . . . are a matter of state concern [and] that such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state." RCW 49.60.010. "The purpose of the statute is to deter and eradicate discrimination in Washington—a public policy of the highest priority." Lodis v. Corbis Holdings, Inc., 172 Wn. App. 835, 848, 292 P.3d 779 (2013) (citing Marquis, 130 Wn.2d at 109; Xieng v. Peoples Nat'l Bank of Wash., 120 Wn.2d 512, 521, 844 P.2d 389 (1993)). Thus, the WLAD is "*preventative* in nature." Glasgow, 103 Wn.2d at 408.

Taken together, these admonitions counsel us that the legislature sought to eliminate all acts of sexual harassment in places of public accommodation and that the statute should not be construed so as to leave any patron victimized by such a discriminatory act without a remedy. We find further support for this conclusion in the wording of the pertinent WLAD provisions, as we will explain hereafter.

B

(1)

With respect to a claim involving sexual harassment, the Arlene's Flowers construct first requires the plaintiff to establish membership in a protected class. 187 Wn.2d at 821. The WLAD prohibits discrimination based on sex while

providing that "'[s]ex' means gender." RCW 49.60.040(25). Thus, the plaintiff must establish that the plaintiff is female and the harasser is male or vice versa.

We leave for another day the situation of same-sex sexual harassment arising in a place of public accommodation. Whether that wrongful act is prohibited by the prohibition against sex discrimination or the prohibition against sexual orientation discrimination, or both, is outside the briefing and record with which we have been favored.

(2)

The second element of the Arlene's Flowers construct requires the plaintiff to establish that "the defendant is a place of public accommodation." 187 Wn.2d at 821. A lengthy definition and listing of places "of public resort, accommodation, assemblage, or amusement" is set forth in RCW 49.60.040(2). Under this definition, places of public accommodation include places "where medical service or care is made available." RCW 49.60.040(2).

In general, plaintiffs must establish that their targeted defendant falls within the ambit of RCW 49.60.040(2). In Floeting's case, he must show that Group Health is a place where medical service or care is made available.

(3)

The third Arlene's Flowers element is "that the defendant discriminated against the plaintiff, whether directly or indirectly." 187 Wn.2d at 821. In a case such as Floeting's, where sexual harassment perpetrated by an employee is alleged, this is a multi-layered inquiry.

In Fell and Arlene's Flowers, the alleged discriminatory acts were those of the leaders of the corporations. There was no question but that, if the acts were wrongful, the corporations were liable. But Floeting's case presents vastly different circumstances.

### (a) Who can be liable?

As previously mentioned, subsection .215(1) identifies those whose actions are restricted by the protections of the statute. "It shall be an unfair practice for any person or the person's agent or employee to commit an act which directly or indirectly results in any distinction, restriction, or discrimination . . . in any place of public . . . accommodation" on account of sex. RCW 49.60.215(1). But who is a "person" under the WLAD?

Fortunately, an answer is provided.

> "Person" includes one or more individuals, partnerships, associations, organizations, corporations, cooperatives, legal representatives, trustees and receivers, or any group of persons; it includes any owner, lessee, proprietor, manager, agent, or employee, whether one or more natural persons; and further includes any political or civil subdivisions of the state and any agency or instrumentality of the state or of any political or civil subdivision thereof.

RCW 49.60.040(19).

This definition is instructive in several respects. First, under the WLAD, it is a "person," as defined, who may be liable for a violation of the statute. Second, considering the legislative choice of words, the context of the act, and the legislature's stated goal to eradicate discrimination, we read section .215 as setting forth a system of direct liability whereby an employer is directly

responsible for its official unfair practices and the unfair practices of its agents and employees. We say this for several reasons.

The words chosen are instructive. It is an unfair practice for "any person or the person's agent or employee" to commit a forbidden act. See RCW 49.60.215(1). This language attributes responsibility for the agent's or employee's discriminatory act to the "person" (employer) without mention of the doctrines of vicarious liability or respondeat superior. In this way, the legislature chose to fight discrimination in public accommodations by making employers directly responsible for their agents' and employees' conduct.

This does not leave agents or employees without potential liability for their own discriminatory acts, however. Rather, the statutory definition also defines "agent or employee" as falling within the definition of "person."

In this way, both the employer/proprietor of a public accommodation and that "person's" employee/agent are directly liable for the discriminatory actions of the employee/agent.

Considering the goal of the statute—to eradicate discrimination in places of public accommodation—it makes sense that the legislature would not want agency principles (such as vicarious liability or respondeat superior) to frustrate its goal. And this would be a real risk, given the nature of both sexual harassment and places of public accommodation.

The sexual harassment of a patron of a business will often be a solitary or fleeting event—one capable of evading sanction under the law. The natural reaction of a sexually harassed business patron, in many situations, will be

- 12 -

simply to refuse to return to that establishment. In this way, however, the discriminatory action escapes detection. Such a state of affairs undermines the legislature's goal of eliminating all such acts of discrimination.

However, by imposing direct liability on business proprietors for the actions of their employees/agents, the legislation serves its purpose. Direct liability makes the proprietor liable for *all* acts of sexual harassment occurring on its premises—including the first. A scheme relying on agency principles would have no such virtue. Instead, it would require the proprietor to have prior knowledge of the harassment before liability could attach. The first act of discrimination would be without liability—a "one free bite" rule directly at odds with the goal of this antidiscrimination enactment. Nothing in the wording of the legislation or the legislature's statement of purpose indicates that such a "one free bite" rule was contemplated by the law's drafters.

Similarly, few employers would be sufficiently stupid to establish job descriptions that mandated that their employees engage in sexual harassment of patrons. Nor would most employers establish job descriptions that countenanced such behavior as being within the scope of employment. But if vicarious liability were the rule, it would allow many acts of sexual harassment to be without a remedy against the proprietor—the entity best suited to demand a discrimination-free environment in the establishment.

Direct liability addresses these deficiencies and furthers the legislature's goal. By making "persons" directly liable for the discriminatory acts of their employees—including the first such act—the statute accomplishes its goal of

- 13 -

seeking the eradication of *all* acts of discrimination. It also incentivizes employers to initiate careful hiring practices and adopt effective antidiscriminatory training and work rules. By taking such actions, employers avoid liability by ensuring that discriminatory acts do not occur.

In short, when the "person" referenced in the statute is a business proprietor, that "person" is directly liable for its own unfair practices and the unfair practices of its agents and employees.

(b) <em>What practices are forbidden?</em>

Having addressed *who* is restricted by the statute, we must now address *what* is proscribed. The third <u>Arlene's Flowers</u> element calls for proof that "the defendant discriminated against the plaintiff." 187 Wn.2d at 821. Under section .215, what is it to "discriminate?"

Subsection .215(1) declares it to be an unfair practice to commit an act "which directly or indirectly results in any distinction, restriction, or discrimination." This statutory passage must be read in conjunction with other WLAD provisions. The WLAD also provides that the

> right to be free from discrimination because of . . . sex . . . is recognized as and declared to be a civil right. This right shall include, but not be limited to:
>
> . . .
>
> (b) The right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement.

RCW 49.60.030(1).

By way of explanation:

> "*Full enjoyment of*" includes the right to purchase any service, commodity, or article of personal property offered or sold on, or by,

> any establishment to the public, and the admission of any person to accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement, *without acts directly or indirectly causing persons of any particular . . . sex . . . to be treated as not welcome, accepted, desired, or solicited.*

RCW 49.60.040(14) (emphasis added).

Thus, the terms "distinction, restriction, or discrimination," set forth in subsection .215(1), necessarily include within their ambit the denial of "full enjoyment," as expressed in subsection .040(14). Acts that produce a result proscribed by either subsection are "unfair practices" and constitute unlawful discrimination.

Having set forth a description of that which constitute discriminatory acts, we must now answer the question: Are there any limitations on when acts can be considered actionable under the WLAD? In fact, there are.

The WLAD is not a "'general civility code.'" Adams v. Able Bldg. Supply, Inc., 114 Wn. App. 291, 297, 57 P.3d 280 (2002) (internal quotation marks omitted) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)). Previously, we have held that, in a place of public accommodation,

> it is not enough that some hasty, chance or inadvertent word or action may offend or even make one *feel* unwelcome. Personal sensitivities differ greatly from one individual to another. The Legislature could not have intended to proscribe mere rhetoric that is subjectively offensive to a particular person.

Evergreen Sch. Dist. No. 114 v. Human Rights Comm'n, 39 Wn. App. 763, 772-73, 695 P.2d 999 (1985).

To be actionable, the asserted discriminatory conduct must be objectively discriminatory. By this we mean that it must be of a type, or to a degree, that a reasonable person who is a member of the plaintiff's protected class, under the same circumstances, would feel discriminated against (as described in subsections .040(14) and .215(1)). This is an objective standard.

This objective standard coincides with subsection .215(1) being construed as imposing direct liability on "persons."[5] Acts that are objectively discriminatory are foreseeable. And foreseeable unfair acts are subject to elimination through proper hiring practices, employee antidiscrimination training, and enforced work rules.

In addition, the plaintiff must establish the plaintiff's *subjective* perception of being discriminated against by the act of sexual harassment. This is so because the statutory provision granting a cause of action provides that "[a]ny person *deeming himself or herself injured* by any act in violation of this chapter shall have a civil action in a court of competent jurisdiction." RCW 49.60.030(2) (emphasis added). This is consistent with subsection .215(1), which proscribes an act "which directly or indirectly *results in* any distinction, restriction, or discrimination." (Emphasis added.)

Thus, the cause of action afforded by subsection .030(2) includes both an objective and a subjective component.

---

[5] We emphasize the difference between direct liability and strict liability. Without an objective standard, subsection .215(1) might be considered a strict liability provision. We "will not construe a statute to impose strict liability absent a clear indication that the Legislature intended to do so." Wright v. Engum, 124 Wn.2d 343, 349, 878 P.2d 1198 (1994) (citing Hyatt v. Sellen Constr. Co., 40 Wn. App. 893, 897, 700 P.2d 1164 (1985)). Nothing in the public accommodation provisions of the WLAD indicate to us that the legislature intended it to be a strict liability statute.

An additional issue must be addressed. In their briefings, the parties contest whether the plaintiff must show that the sexual harassment was "severe and pervasive." The "severe and pervasive" standard is one commonly found in employment law harassment jurisprudence. But it has no place in a sexual harassment lawsuit brought under subsection .215(1). If a single act or event of sexual harassment in a place of public accommodation is egregious enough to meet the applicable objective standard, it is irrelevant whether it is in any other way "severe." Similarly, when sexual harassment in a place of public accommodation takes the form of a series of acts or events, a case is likewise made if the sexual harassment meets the objective standard, without regard to whether it is in any other way "pervasive."

To satisfy the third element of the Arlene's Flowers construct, a plaintiff claiming sexual harassment must show that "the defendant discriminated against the plaintiff, whether directly or indirectly." 187 Wn.2d at 821. This requires Floeting to prove that Group Health is a "person" under the act, that Group Health's employee discriminated against him by subjecting him to sexual harassment, and that the sexual harassment resulted in him subjectively perceiving a "distinction, restriction, or discrimination" in the way that he was afforded access to Group Health's services or denied him the "full enjoyment" of the public accommodation, in that he felt "not welcome, accepted, desired, or solicited." Finally, he must show that a reasonable person in his protected class, under the same circumstances, would have felt similarly discriminated against (the objective standard).

## (4)

The fourth Arlene's Flowers element is "that the discrimination occurred 'because of' the plaintiff's status or, in other words, that the protected status was a substantial factor causing the discrimination." 187 Wn.2d at 821-22. Where the discriminatory action is sexual harassment, this requires that the plaintiff show that his gender was a substantial factor in the harassment taking place.

## V

Notwithstanding the foregoing (including the Arlene's Flowers decision), Group Health avers that we should instead measure the sufficiency of Floeting's cause of action pursuant to the test set forth in Glasgow, 103 Wn.2d 401, which concerned sexual harassment in the employment context.[6] This was the argument that Group Health made before the trial court at summary judgment.

Group Health is wrong. The Glasgow case was brought pursuant to RCW 49.60.180, a section regulating "unfair practices of employers." In deciding the case, our Supreme Court relied on a federal law analogue not applicable to public accommodation discrimination. And the basis for the court's decision has no applicability to Floeting's claim.

In Glasgow, our Supreme Court held that, pursuant to the WLAD, an employer was liable for sex discrimination by acquiescing to sexual harassment committed by one employee against other employees. In that case,

> [t]he plaintiff-employees established that they were subjected to
> uninvited sexual harassment by a co-worker with the actual
> knowledge of two supervisory personnel who undertook no

---

[6] The Glasgow decision premised employer liability on the employer's actual or constructive knowledge of the sexual harassment taking place. 103 Wn.2d at 407.

> reasonably prompt and adequate remedial measures to alleviate the resulting hostile and intimidating work environment in which the employees found themselves.

Glasgow, 103 Wn.2d at 404. Notably, the court characterized the plaintiffs' claim to be "that their *employer* implicitly, but effectively, *made* their endurance of sexual intimidation a *term or condition* of their employment." Glasgow, 103 Wn.2d at 405 (emphasis added).

The phrase "term or condition of their employment" was of great significance. The relevant statute made it wrongful for an employer "[t]o discriminate against any person . . . in other terms or conditions of employment because of . . . sex." RCW 49.60.180(3). Because it is the employer who sets the terms or conditions of employment, and because Glasgow's employer had allowed the sexual harassment to continue, the court reasoned that the employer had made subjugation to the sexual harassment a "term or condition" of the plaintiff-employees' employment—thus violating RCW 49.60.180.

In reaching its decision, the Supreme Court acknowledged that it was borrowing its analysis from federal law analyzing Title VII workplace sexual harassment cases. Glasgow, 103 Wn.2d at 404-05, 406 n.2.

There is nothing in Glasgow that causes us to believe that we should follow its analytical construct, rather than the Arlene's Flowers construct, in analyzing a claim brought under RCW 49.60.215.

Similarly, Robel v. Roundup Corp., 148 Wn.2d 35, 59 P.3d 611 (2002), another section .180 decision, does not properly guide our analysis. In that case, involving a disability discrimination claim, the Supreme Court turned to federal

case law applying the Americans with Disabilities Act[7] to construe section .180. Robel, 148 Wn.2d at 43-44. The Robel court also ruled that to prove that an employer had altered the "terms or conditions of employment,"[8] actual or constructive knowledge by the employer of the discrimination needed to be proved. 148 Wn.2d at 45.

RCW 49.60.215 does not contain "terms or conditions" of employment language. The decisions in Glasgow and Robel are not helpful in analyzing a section .215 claim. Instead, we follow Arlene's Flowers.

VI

Floeting contends that the trial court erred by granting summary judgment on behalf of Group Health because Group Health deprived him of his right against sex discrimination in a place of public accommodation. This is so, he asserts, because genuine issues of material fact remain as to whether T.T., a Group Health employee, engaged in an unlawful practice of sexual harassment against him while he visited a Group Health medical facility. We agree.

As to the first Arlene's Flowers element, Floeting is male. His gender puts him in a protected class when his claim is that he was sexually harassed because of his male gender. There is no serious doubt that this element is met.

As to the second Arlene's Flowers element, Floeting establishes that Group Health is a place of public accommodation because it is a place "where

---

[7] Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12213.
[8] A phrase and requirement common to RCW 49.60.180(3), Title VII, and the ADA.

- 20 -

medical service or care is made available." RCW 49.60.040(2). The requirement of this element is met.

As to the fourth Arlene's Flowers element, the evidence is sufficient to establish, for summary judgment purposes, that Floeting was sexually harassed because he was male. Thus, this element is met.

As to the third Arlene's Flowers element, that Group Health's employee discriminated against Floeting by sexually harassing him, material questions of fact exist, precluding summary judgment.

The parties do not dispute that Floeting's visits to the medical center and T.T.'s work schedule at that medical center overlapped on numerous occasions. It is undisputed that, between July and September 25, 2012, Floeting visited the medical center—for medical appointments and to pick up prescription medication—on a total of 11 occasions (July 2, July 11, July 17, July 24, August 1, August 14, August 15, August 23 (twice), September 5, September 17).[9] It is further undisputed that the hours during which T.T. was scheduled to work at the medical center overlapped with at least 7—or as many as 9—of the 11 occasions that Floeting visited there (July 2 , July 11, July 17, July 24, August 14, August 15, September 5, September 17).[10] In addition, there is no dispute that T.T. had

_____

[9] Floeting also visited the medical center for an appointment and for prescription medicine on September 28, but because T.T.'s employment was terminated on September 25, his visit on September 28 is not probative.

[10] T.T. was on leave from work at the medical center on August 1 and 23. In addition, Floeting, at an unspecified time, picked up prescription medication on July 17 and August 14 and T.T. worked from approximately 8:00 a.m. to 5:00 p.m. on both of those days. Thus, if Floeting arrived at the medical center between the hours of 8:00 a.m. and 5:00 p.m. on those days, T.T. would have worked on 9 of the 11 occasions that Floeting visited the medical center during the period in question.

checked-in Floeting for his appointments on two of these occasions (July 11 and July 24).

There are several inconsistencies in the dates alleged by Floeting regarding when the harassment occurred.[11] But numerous key facts are undisputed and genuine issues of material fact exist for resolution at trial. It is undisputed that, in August 2012, T.T. had told Floeting about the weekend that she spent engaging in sexual activities with her boyfriend. It is also undisputed that, between July and September 2012, there were 7 to 9 occasions during which T.T. and Floeting were both located at the medical center at the same time. In addition, Floeting asserts that, when he visited the medical center, T.T. would approach him and engage in sexually suggestive and sexually explicit conduct, notwithstanding that T.T. was not the employee who greeted him and checked him in for his appointments.

Further, a declaration by Floeting's niece, Deiona Harris—who frequently accompanied Floeting when he visited the medical center—generally corroborated that T.T. made sexual comments to Floeting between July and

---

[11] Group Health asserts that there is an absence of evidence of the harassment because Floeting was inconsistent regarding the dates on which he alleges that T.T. had harassed him.

Floeting's recollection of when the harassing conduct occurred was stated inconsistently in his complaint, his deposition testimony, and his declaration in opposition to summary judgment. In his complaint—filed in July 2015—Floeting alleged that the harassing conduct occurred between August and October 2012, that T.T.'s comment regarding the weekend she spent with her boyfriend occurred in late August, that the harassing conduct continued into September 2012 when he visited the medical center a "half dozen times or so," and that his final interaction with her occurred "in or about mid-October." As mentioned, T.T.'s employment was terminated in late September 2012.

In his deposition testimony, Floeting stated that the harassing events began in July, that T.T.'s comment about her weekend with her boyfriend occurred on August 23 or 24, and that the conduct continued on September 11, 17, and 28.

In his declaration, Floeting stated that T.T.'s comment about her boyfriend occurred on August 14 or 15 and, rather than supplying specific dates on which the harassing conduct occurred, stated that the harassing conduct continued into September.

September 2012, including T.T.'s comment regarding the weekend she spent with her boyfriend. Group Health did not address Harris's declaration in its briefing before the trial court or before us.

Taking all reasonable inferences in Floeting's favor, T.T.'s repeated sexually suggestive advances toward Floeting raise genuine issues of material fact as to whether Floeting was discriminated against by Group Health's employee, thus depriving him of the full enjoyment of the services offered by Group Health. Sufficient evidence was presented on both the objective and subjective aspects of Floeting's perception of discrimination.

The trial court erred by granting summary judgment in favor of Group Health.

Reversed.

We concur: